# EXHIBIT A

**Execution Copy**

**LET'S SHAKE, L.L.C.**

**LOAN AGREEMENT**

dated as of December 4, 2020

**THE HUNTINGTON NATIONAL BANK**

## TABLE OF CONTENTS


ARTICLE 1. DEFINITIONS ..... 1
1.1. Certain Definitions ..... 1
1.2. UCC Definitions; Other Definitions; Rules of Construction ..... 12
1.3. Accounting Terms and Determinations ..... 12
ARTICLE 2. THE COMMITMENT AND THE LOANS ..... 13
2.1. Commitment of Lender ..... 13
2.2. Up-Front Fee ..... 13
2.3. Disbursement of Loans ..... 14
2.4. Conditions for the Initial Extension of Credit ..... 14
2.5. Further Conditions ..... 15
2.6. Security and Collateral ..... 16
2.7. Joint and Several Obligations ..... 16
ARTICLE 3. PAYMENTS AND PREPAYMENTS ..... 17
3.1. Payments and Prepayments ..... 17
3.2. Posting and Application of Payments ..... 18
3.3. No Setoff or Deduction ..... 18
3.4. Computation of Interest ..... 19
3.5. Additional Costs ..... 19
3.6. LIBO Rate – Change in Law; Capital Adequacy; Loss ..... 19
3.7. Indemnification ..... 20
3.8. Applicable Lending Office ..... 20
ARTICLE 4. REPRESENTATIONS AND WARRANTIES ..... 21
4.1. Existence and Power ..... 21
4.2. Authority ..... 21
4.3. Binding Effect ..... 21
4.4. Subsidiaries ..... 22
4.5. Litigation ..... 22
4.6. Financial Condition ..... 22
4.7. Use of the Loans ..... 22
4.8. Consents, Etc ..... 22
4.9. Taxes ..... 22
4.10. Title to Properties ..... 23
4.11. ERISA ..... 23
4.12. Disclosure ..... 23
4.13. Environmental Matters ..... 23
4.14. No Default ..... 23
4.15. No Burdensome Restrictions ..... 23
4.16. Labor Matters ..... 24
4.17. Solvency ..... 24
4.18. Not an Investment Borrower; Other Regulations ..... 24
4.19. Intellectual Property ..... 24
4.20. Anti-Terrorism Laws ..... 24
4.21. OSHA ..... 24
4.22. Franchise Documents ..... 25
4.23. Leases ..... 25
4.24. Beneficial Ownership Certificate ..... 25
ARTICLE 5. COVENANTS ..... 25
5.1. Affirmative Covenants ..... 25

5.2. Negative Covenants ........ 29
5.3. Financial Covenants ........ 32
ARTICLE 6. DEFAULT ........ 34
6.1. Events of Default ........ 34
6.2. Remedies ........ 36
6.3. Protective Advances ........ 37
ARTICLE 7. MISCELLANEOUS ........ 37
7.1. Amendments; Consents and Waivers; Authentication ........ 37
7.2. Notices ........ 37
7.3. No Waiver By Conduct; Remedies Cumulative ........ 37
7.4. Reliance on and Survival of Various Provisions ........ 38
7.5. Expenses; Indemnification ........ 38
7.6. Successors and Assigns ........ 39
7.7. Counterparts ........ 40
7.8. Governing Law ........ 40
7.9. Table of Contents and Headings ........ 40
7.10. Construction of Certain Provisions ........ 40
7.11. Integration and Severability ........ 40
7.12. Independence of Covenants ........ 40
7.13. Interest Rate Limitation ........ 40
7.14. Nonliability of Lender ........ 41
7.15. Waiver of Jury Trial ........ 41
7.16. USA PATRIOT Act ........ 41
7.17. Waiver of Notice ........ 41

THIS LOAN AGREEMENT, dated as of December 4, 2020 (this "Agreement"), is by and among, **LET'S SHAKE, L.L.C.**, a Texas limited liability company (the "Company") and any other Person who becomes a "Borrower" under this Agreement pursuant to a joinder or similar agreement (each individually a "Borrower" and collectively, "Borrowers") and **THE HUNTINGTON NATIONAL BANK**, a national banking association ("Lender").

In consideration of the mutual agreements, provisions and covenants contained herein, the parties agree as follows:

ARTICLE 1.
DEFINITIONS

1.1. Certain Definitions. As used herein the following terms shall have the following respective meanings:

"Affiliate" shall mean as to any Person, any other Person (excluding any Foreign Subsidiary) which, directly or indirectly, is in control of, is controlled by, or is under common control with such Person. For purposes of this definition, a Person shall be deemed to be "controlled by" a Person if such Person possesses, directly or indirectly, power either (i) to vote more than 25% of the securities having ordinary voting power for the election of directors of such Person or (ii) to direct or cause the direction of the management and policies of such Person whether by contract or otherwise.

"Anti-Terrorism Laws" means those laws and sanctions relating to terrorism or money laundering, including Executive Order No. 13224, the USA Patriot Act (Public Law 107-56), the Bank Secrecy Act (Public Law 91-508), the Trading with the Enemy Act (50 U.S.C. App. Section 1 et. seq.), the International Emergency Economic Powers Act (50 U.S.C. Section 1701 et. seq.), and the sanction regulations promulgated pursuant thereto by the Office of Foreign Assets Control, as well as laws relating to prevention and detection of money laundering in 18 U.S.C. Sections 1956 and 1957 (as any of the foregoing may from time to time be amended, renewed, extended or replaced).

"Applicable Lending Office" means, with respect to any Loan, the office of Lender or of any Affiliate of Lender designated by Lender to Borrowers from time to time.

"Applicable Margin" means two hundred seventy-five basis points (275 bps).

"Banking Services" means any service or product extended to any Loan Party by Lender or any of its Affiliates including: (a) credit cards, (b) credit card processing services, (c) debit cards, (d) purchase cards, (e) ACH transactions, and (f) cash management and treasury services.

"Banking Services Obligations" means any and all obligations of any Loan Party, whether absolute or contingent and howsoever and whensoever created, arising, evidenced or acquired (including all renewals, extensions and modifications thereof and substitutions therefor) in connection with Banking Services.

"Beneficial Ownership Certification" means a certification regarding beneficial ownership as required by the Beneficial Ownership Regulation.

"Beneficial Ownership Regulation" means 31 CFR § 1010.230.

"Blocked Person" means any of the following: (a) a Person that is listed in the annex to, or is otherwise subject to the provisions of, the Executive Order No. 13224; (b) a Person owned or controlled by, or acting for or on behalf of, any Person that is listed in the annex to, or is otherwise subject to the provisions of, the Executive Order No. 13224; (c) a Person with which Lender is prohibited from dealing or otherwise engaging in any transaction by any Anti-Terrorism Law; (d) a Person that commits, threatens or conspires to commit or supports "terrorism" as defined in the Executive Order No. 13224; or (e) a Person that is named as a "specially designated national" on the most current list published by the U.S. Treasury Department Office of Foreign Asset Control at its official website or any replacement website or other replacement official publication of such list.

"Board of Directors" means (1) with respect to a corporation, the board of directors of the corporation or such directors or committee serving a management function; (2) with respect to a limited liability company, the board of managers of the company or such managers or committee serving a management function; (3) with respect to a partnership, the Board of Directors of the general partner of the partnership; and (4) with respect to any other Person, the managers, directors, trustees, board or committee of such Person or its owners serving a management function.

"Business Day" means any day other than a Saturday, a Sunday, or other day on which Lender is authorized or required to be closed; and if the applicable Business Day relates to any Loan accruing interest based on the LIBO Rate, such day must also be a day for trading by and between banks in US dollar deposits in the London interbank market.

"Buyout Reimbursement Payment" means payment by the Company to Let's Shake On It, LL.C. on or before December 31, 2020 in an aggregate amount not to exceed $3,045,114.00, to reimburse Let's Shake On It, L.L.C. for its payment of the purchase price in connection with the Joint Venture Buyout.

"Capital Lease" of any Person means any lease which, in accordance with GAAP, is or should be capitalized on the books of such Person.

"Capital Stock" means (a) in the case of any corporation, all capital stock (whether common, preferred or any other type) and any securities exchangeable for or convertible into capital stock and any warrants, rights or other options to purchase or otherwise acquire capital stock or such securities or any other form of equity securities, (b) in the case of an association or business entity, any and all shares, interests, participations, rights or other equivalents (however designated) of corporate stock, (c) in the case of a partnership or limited liability company, partnership, membership or limited liability company interests (whether general or limited) and (d) any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distribution of assets of, the issuing Person.

"CARES Act" means the Coronavirus Aid, Relief, and Economic Security Act, or the CARES Act and applicable rules and regulations, as amended from time to time.

"CARES Forgivable Uses" means uses of proceeds of an SBA PPP Loan that result in the SBA PPP Loan to be eligible for forgiveness under Section 1106 of the CARES Act.

"CARES Payroll Costs" means "payroll costs" as defined in 15 U.S.C. 636(a)(36)(A)(viii) (as added to the Small Business Act by Section 1102 of the CARES Act).

"CEA Swap Liability" means, with respect to any Guarantor, any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of section 1a(47) of the Commodity Exchange Act.

"Change in Law" means the occurrence, after the date of this Agreement, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation or application thereof by any Governmental Authority, or (c) the making or issuance of any request, rules, guideline, requirement or directive (whether or not having the force of law) by any Governmental Authority; provided however, that notwithstanding anything herein to the contrary, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines, requirements and directives thereunder, issued in connection therewith or in implementation thereof, and (ii) all requests, rules, guidelines, requirements and directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law" regardless of the date enacted, adopted, issued or implemented.

"Change in Control" shall be deemed to occur if (i) Let's Shake On It, L.L.C. shall fail to maintain 99% of the outstanding voting equity interests, directly or indirectly, of the Company on a fully diluted basis, free and clear of all liens (other than in favor of Lender); (ii) Sunil D. Dharod (or his Trusts) shall fail to maintain at least 75% of the outstanding voting equity interests, directly or indirectly, of Let's Shake On It, L.L.C. and the Company and on a fully diluted basis, free and clear of all liens (other than in favor of Lender); (iii) any Borrower shall fail to maintain a majority of the directors or managers who constitute the board of directors or the managing body of such Borrower on the date hereof, unless replacement of any exiting board or managing body member (other than owing to death or disability) shall have been approved by such board of directors or managing body as constituted on the date hereof, or (iv) any Borrower shall fail to maintain 100% of the outstanding voting equity interests of any existing or future Subsidiary, free and clear of all liens (other than in favor of Lender).

"Code" means the Internal Revenue Code of 1986, as amended from time to time, and the regulations thereunder.

"Collateral" means all of the following real and personal property owned by each Borrower and any other Loan Party required to execute a Security Agreement pursuant to this Agreement, whether now owned or existing, or hereafter arising or acquired or received by each Borrower and any other such Loan Party required to execute a Security Agreement pursuant to this Agreement, wherever located:

(a) all Accounts; all Inventory; all Equipment and Fixtures; all General Intangibles, Payment Intangibles, and Intellectual Property; all Investment Property and Subsidiary Interests; all Deposit Accounts and any and all monies credited by or due from any financial institution or any other depository; all Goods and other personal property, including all merchandise returned or rejected by Account Debtors, relating to or securing any of the Accounts; all rights as a consignor, a consignee, an unpaid vendor, mechanic, artisan, or other lienor, including stoppage in transit, setoff, detinue, replevin, reclamation and repurchase; all additional amounts due to any Borrower or any other such Loan Party from any Account Debtors relating to the Accounts; other property, including warranty claims, relating to any Goods; all contract rights, rights of payment earned under a contract right, Instruments (including promissory notes), Chattel Paper (including electronic chattel paper), Documents, warehouse receipts, letters of credit, and money; all Commercial Tort Claims (whether now existing or hereafter arising); all Letter-of-Credit Rights (whether or not such Letter of Credit is evidenced by a writing); all Supporting Obligations; all real and personal property of third parties in which any Borrower or any other such Loan

Party has been granted a lien or security interest as security for the payment or enforcement of Accounts; and any other goods or personal property, if any, in which any Borrower or any other such Loan Party may hereafter in writing grant a security interest to Lender hereunder, or in any amendment or supplement hereto or thereto, or under any other agreement between Lender and any Borrower or any other such Loan Party;

(b) Borrower's and such Loan Party's ledger sheets, ledger cards, files, correspondence, records, books of account, business papers, computers, computer software (owned by any Borrower or any such Loan Party or in which it has an interest), computer programs, electronic media, tapes, disks and documents relating to subsection (a) of this definition of Collateral;

(c) any real property now or hereafter owned by any Borrower or any such Loan Party; and

(d) all proceeds and products of subsections (a) through (c) of this definition of Collateral in whatever form, including: cash, deposit accounts (whether or not comprised solely of proceeds), certificates of deposit, insurance proceeds (including hazard, flood and credit insurance), negotiable instruments and other instruments for the payment of money, chattel paper, security agreements, documents, eminent domain proceeds, condemnation proceeds and tort claim proceeds.

"Collateral Access Agreement" means each agreement (each of which shall be in form and substance satisfactory to Lender) among Lender, the respective Loan Party and any third party (including without limitation any landlord, bailee, processor, consignee or customs broker) in possession or control of any Collateral or that is the owner of the real property on which any Collateral is located, as each such agreement may be amended, restated, or otherwise modified from time to time.

"Commitment" means the commitment of Lender to make Term Loan A in the principal amount of up to $7,200,000 pursuant to Section 2.1 of this Agreement.

"Commodity Exchange Act" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended from time to time, and any successor statute.

"Consolidated EBITDA" is defined in Section 5.3(a).

"Consolidated EBITDAR" is defined in Section 5.3(a).

"Consolidated Fixed Charges" is defined in Section 5.3(a).

"Consolidated Lease-Adjusted Total Funded Indebtedness" is defined in Section 5.3(c).

"Contingent Liabilities" means as to any Person any obligation of such Person guaranteeing or intending to guarantee any indebtedness, obligations and liabilities ("primary obligations") of any other Person (the "primary obligor") in any manner, whether directly or indirectly, including, without limitation, any obligation of such Person, whether or not contingent, (a) to purchase any such primary obligation or any property constituting direct or indirect security therefor, (b) to advance or supply funds (i) for the purchase or payment of any such primary obligation or (ii) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligator, (c) to purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation or (d) otherwise to assure or hold harmless the owner of such primary obligation against loss in respect thereof; provided however, that the term Contingent Liabilities shall not

include endorsements of instruments for deposit or collection in the ordinary course of business; The amount of any Contingent Liability shall be deemed to be an amount equal to the lesser of (x) the stated or determinable amount of the primary obligation in respect of which such Contingent Liability is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof (assuming such Person is required to perform thereunder) as determined by such Person in good faith and (y) the maximum principal amount for which such Person is responsible under the contract establishing the Contingent Liability (for example, a contractual limit under a guarantee agreement).

"Contractual Obligation" means as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"Default" means any event or condition which might become an Event of Default with notice or lapse of time or both.

"Disqualified Stock" means any Capital Stock that, by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable), or upon the happening of any event, matures or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, or redeemable at the option of the holder thereof, in whole or in part prior to a date one year after the Maturity Date.

"Dollars" and "$" means the lawful money of the U.S.

"Effective Date" means the date on which all conditions precedent specified in Section 2.4 are satisfied or waived in accordance with this Agreement.

"Environmental Laws" at any date means all provisions of law, statute, ordinances, rules, regulations, judgments, writs, injunctions, decrees, orders, awards and standards promulgated by a Governmental Authority concerning the protection of, or regulating the discharge of Hazardous Materials into, the environment.

"ERISA" means the Employee Retirement Income Security Act of 1974, as the same may be amended or supplemented from time to time, and any successor statute of similar import and the rules and regulations promulgated thereunder as from time to time in effect.

"ERISA Affiliate" means, with respect to any Person which, together with such Person or any Subsidiary of such Person, would be treated as a single employer under Section 414 of the Code and the regulations promulgated thereunder.

"Event of Default" is defined in Section 6.1.

"Excluded Swap Liability" means, with respect to any Guarantor, any CEA Swap Liability if, and to the extent that, all or a portion of the Guaranty of such Guarantor of, or the grant by such Guarantor of a security interest to secure, such CEA Swap Liability (or any guarantee thereof or other Contingent Liability with respect thereto) is or becomes illegal under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such Guarantor's failure for any reason not to constitute an "eligible contract participant" as defined in the Commodity Exchange Act at the time the Guaranty or other Contingent Liability of such Guarantor becomes effective with respect to such related CEA Swap Liability.

"Fiscal Quarter" means any of the quarterly periods of the Company ending on March 31, June 30, September 30 and December 31 of each year.

"Fiscal Year" means any of the annual accounting periods of the Company ending on December 31 of each year.

"Foreign Subsidiary" means any Subsidiary that is not organized or incorporated in the United States or any state or territory thereof.

"Franchise Agreement" means any franchise or license agreement in effect between any Borrower and Sonic.

"Franchise Documents" means all documents entered into by Sonic and any Borrower in connection with any lease, license, or franchise given by Sonic for the operation of the Restaurants, as the same may be amended or otherwise modified from time to time and including all renewals and extensions thereof.

"GAAP" means Generally Accepted Accounting Principles as promulgated by the United States of America Financial Accounting Standards Board in the United States of America in effect from time to time, applied on a basis consistent with the most recent audited consolidated financial statements of the Company and its Subsidiaries delivered to Lender.

"Governmental Authority" means the government of the U.S., any other nation or any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"Guaranty" means each guaranty entered into by any Guarantor for the benefit of Lender, in form and substance satisfactory to Lender, and as amended or modified from time to time.

"Guarantors" means any Person entering into a Guaranty from time to time. As of the Effective Date, there are no Guarantors.

"Hazardous Materials" means any material or substance: (1) which is or becomes defined as a hazardous substance, pollutant, or contaminant, pursuant to the Comprehensive Environmental Response Compensation and Liability Act ("CERCLA") (42 USC §9601 et. seq.) as amended and regulations promulgated under it; (2) containing gasoline, oil, diesel fuel or other petroleum products; (3) which is or becomes defined as hazardous waste pursuant to the Resource Conservation and Recovery Act ("RCRA") (42 USC §6901 et. seq.) as amended and regulations promulgated under it; (4) containing polychlorinated biphenyls (PCBs); (5) containing asbestos; (6) which is radioactive; (7) the presence of which requires investigation or remediation under any Environmental Law; (8) which is or becomes defined or identified as a hazardous waste, hazardous substance, hazardous or toxic chemical, pollutant, contaminant, or biologically Hazardous Material under any Environmental Law.

"Hedging Contract" means any foreign exchange contract, currency swap agreement, futures contract, commodities hedge agreement, interest rate protection agreement, interest rate future agreement, interest rate swap agreement, interest rate cap agreement, interest rate collar agreement, option agreement or any other similar hedging agreement or arrangement entered into by a Person in the ordinary course of business.

"Hedging Obligations" means any and all obligations of any Borrower, whether absolute or contingent and howsoever and whensoever created, arising, evidenced or acquired (including all renewals, extensions and modifications thereof and substitutions therefor) owing to Lender or any of its Affiliates under any and all Hedging Contracts.

"Indebtedness" of any Person means, as of any date, (a) all obligations of such Person for borrowed money or similar obligations, (b) all obligations of such Person as lessee under any Capital Lease, (c) all obligations which are secured by any Lien existing on any asset or property of such Person whether or not the obligation secured thereby shall have been assumed by such Person (to the extent of such Lien if such obligation is not assumed), (d) all obligations of such Person for the unpaid purchase price for goods, property or services acquired by such Person, except for trade accounts payable arising in the ordinary course of business that are not past due, (e) all obligations of such Person to purchase goods, property or services where payment therefor is required regardless of whether delivery of such goods or property or the performance of such services is ever made or tendered (generally referred to as "take or pay contracts"), (f) all liabilities of such Person in respect of Unfunded Benefit Liabilities under any Plan of such Person or of any ERISA Affiliate, (g) all obligations of such Person in respect of any Hedging Contract or other similar transaction (valued in an amount equal to the highest termination payment, if any, that would be payable by such Person upon termination for any reason on the date of determination), (h) all reimbursement and similar obligations under outstanding letters of credit, bankers acceptances or similar instruments in respect of drafts or other claims which may be presented or have been presented and have not yet been paid, (i) the aggregate outstanding amount of all Off Balance Sheet Liabilities, based on the aggregate outstanding amount as if such transaction were structured as a secured loan and an on balance sheet financing, whether or not shown as a liability on a balance sheet of any Borrower, and (j) all Contingent Liabilities, based on the maximum amount that may be payable thereunder, of such Person with respect to or relating to Indebtedness of others similar in character to those described in clauses (a) through (i) of this definition.

"Joint Venture Buyout" means the conveyance by SRI Operating Company to Let's Shake On It, L.L.C. of all of its ownership interest in the Company on June 30, 2020.

"LIBO Rate" means the rate obtained by dividing: (1) the actual or estimated per annum rate, or the arithmetic mean of the per annum rates, of interest for deposits in U.S. dollars in the London interbank market for the related LIBO Rate Interest Period, as determined by the Lender in its discretion based upon reference to information which appears on page LIBOR01, captioned ICE Benchmark Administration Interest Settlement Rates, of the Reuters America Network, a service of Reuters America Inc. (or such other page that may replace that page on that service for the purpose of displaying London interbank offered rates; or, if such service ceases to be available or ceases to be used by the Lender, such other reasonably comparable money rate service as the Lender may select) or upon information obtained from any other reasonable procedure, as of two Business Days prior to the first day of a LIBO Rate Interest Period; by (2) an amount equal to one minus the stated maximum rate (expressed as a decimal), if any, of all reserve requirements (including, without limitation, any marginal, emergency, supplemental, special or other reserves) that is specified on the first day of each LIBO Rate Interest Period by the Board of Governors of the Federal Reserve System (or any successor agency thereto) for determining the maximum reserve requirement with respect to eurocurrency funding (currently referred to as "Eurocurrency liabilities" in Regulation D of such Board) maintained by a member bank of such System, or any other regulations of any governmental authority having jurisdiction with respect thereto as conclusively determined by the Lender. Subject to any maximum or minimum interest rate limitation specified herein or by applicable law, any variable rate of interest on the obligation evidenced hereby shall change automatically, without notice to the Borrowers, on the first day of each LIBO Rate Interest Period. Except for the first interest rate change, the interest rate change will not occur more often than each month. Notwithstanding the foregoing, if the LIBO Rate shall be less than 0.50%, such rate shall be

deemed to be 0.50% for purposes of this Agreement; provided that if the Borrower shall enter into an interest rate swap agreement with the Lender or another counterparty reasonably acceptable to the Lender with respect to at least seventy-five per cent (75%) of the outstanding principal balance of the Term Loan, from and after the effective date of such swap, the foregoing LIBO Rate floor (and the floor applicable to any Replacement Index) shall be reduced from .50% to zero with respect to the Term Loan so long as such interest rate swap agreement shall remain in effect with respect to at least seventy-five per cent (75%) of the outstanding principal balance of the Term Loan.

"LIBO Rate Interest Period" shall mean one (1) month, provided that: (1) if any LIBO Rate Interest Period would otherwise expire on a day which is not a Business Day, the LIBO Rate Interest Period shall be extended to the next succeeding Business Day (provided, however, that if such next succeeding Business Day occurs in the following calendar month, then the LIBO Rate Interest Period shall expire on the immediately preceding Business Day).

"Lien" means any pledge, assignment, hypothecation, mortgage, security interest, deposit arrangement, option, conditional sale or title retaining contract, sale and leaseback transaction, financing statement filing, lessor's or lessee's interest under any lease, subordination of any claim or right, or any other type of lien, charge, encumbrance, preferential arrangement or other claim or right.

"Loan" and "Loans" shall mean the Term Loan.

"Loan Documents" means this Agreement, the Notes, any guaranties, including the Guaranty, any security agreements, mortgages, collateral assignments, pledge agreements, account assignments, control agreements, and each other Security Document, any letter of credit application and agreement or other reimbursement agreements, the Patriot Act Certificate, any subordination agreements, intercreditor agreements and any and all other agreements, instruments and documents, including powers of attorney, consents, and all other writings heretofore, now or hereafter executed by any Borrower or any other Loan Party or delivered to Lender in connection with this Agreement

"Loan Party" means any Borrower, any Guarantor or any other Person who becomes a party to this Agreement pursuant to a joinder or similar agreement and their respective successors and assigns.

"Loan Rate" means a per annum rate equal to the sum of (a) LIBO Rate plus (b) the Applicable Margin.

"Margin Stock" means "margin stock" as defined in Regulations U and X of the Board of Governors of the Federal Reserve System as from time to time in effect or "margin security", "marginable OTC stock" or "foreign margin stock" within the meaning of Regulation T or X of the Board of Governors of the Federal Reserve System as from time to time in effect.

"Material Adverse Change" or "Material Adverse Effect" means any set of circumstances or events which (a) have or could reasonably be expected to have any material adverse effect upon the validity or enforceability of any Loan Document, (b) have or could reasonably be expected to have a material and adverse effect upon the business, assets, financial condition or results of operations of Borrower, (c) impairs materially or could reasonably be expected to impair materially the ability of the Loan Parties taken as a whole to duly and punctually pay or perform any of their Obligations, or (d) impairs materially or could reasonably be expected to impair materially the ability of Lender to enforce its legal remedies pursuant to this Agreement or any other Loan Document.

"Maturity Date" means the earlier to occur of (a) September 30, 2025 and (b) the date any Loan is accelerated pursuant to Section 6.2.

"Multiemployer Plan" means any "multiemployer plan" as defined in Section 4001(a)(3) of ERISA or Section 414(f) of the Code.

"Notes" means any promissory note of Borrowers evidencing the Loans, in form and substance satisfactory to Lender, as amended or modified from time to time and together with any promissory note or notes issued in exchange or replacement therefor.

"Obligations" means all unpaid principal of and accrued and unpaid interest on the Loans, all accrued and unpaid fees and all expenses, reimbursements, indemnities and other obligations of any of the Loan Parties to Lender or any of its Affiliates arising under the Loan Documents, whether absolute or contingent and howsoever and whensoever created, arising, evidenced or acquired (including all renewals, extensions and modifications thereof and substitutions therefor).

"OFAC" is defined in Section 5.1(b).

"Off-Balance Sheet Liability" of a Person means (i) any liability of such Person with respect to accounts or notes receivable sold by such Person or other asset securitization, (ii) any liability under any sale and leaseback transaction which is not a Capital Lease, (iii) any liability under any so-called "synthetic lease" or "tax ownership operating lease" transaction entered into by such Person, or (iv) any obligation arising with respect to any other transaction which is the functional equivalent of or takes the place of borrowing (as reasonably determined by Lender) but which does not constitute a liability on the balance sheets of such Person, but excluding from this clause (iv) operating leases.

"Owner" means with respect to any Borrower, each Person having legal or beneficial title to an ownership interest in such Borrower or a right to acquire such an interest.

"Pass-Through Tax Liabilities" means the amount of state and federal income tax required to be paid by Borrower's Owners on taxable income earned by Borrower and attributable to the Owners as a result of Borrower's "pass-through" tax status, after taking into account any deduction for state income taxes in calculating the federal income tax liability and all other deductions, credits, deferrals and other reductions available to the Owners from or through Borrower.

"Patriot Act" means the USA PATRIOT Act (Title III of Publ. L. 107-56 (signed into law October 26, 2001)).

"Patriot Act Certificate" means a USA Patriot Act Certificate signed by each Loan Party in form and substance satisfactory to Lender.

"PBGC" means the Pension Benefit Guaranty Corporation and any entity succeeding to any or all of its functions under ERISA.

"Permitted Indebtedness" means Indebtedness permitted by Section 5.2(a) hereof.

"Permitted Liens" means Liens permitted by Section 5.2(b) hereof.

"Person" means any individual, sole proprietorship, partnership, corporation, business trust, joint stock company, trust, unincorporated organization, association, limited liability company, institution, public benefit corporation, joint venture, entity or governmental body.

"Plan" means, with respect to any Person, any pension plan (including a Multiemployer Plan) subject to Title IV of ERISA or to the minimum funding standards of Section 412 of the Code which has been established or maintained by such Person, any Subsidiary of such Person or any ERISA Affiliate, or by any other Person if such Person, any Subsidiary of such Person or any ERISA Affiliate could have liability with respect to such pension plan.

"Prohibited Transaction" means any transaction involving any Plan which is proscribed by Section 406 of ERISA or Section 4975 of the Code.

"Protective Advances" is defined in Section 6.3.

"Reference Period" with respect to any date of determination, means (except as may be otherwise expressly provided herein) the period of four consecutive Fiscal Quarters of Company and its Subsidiaries immediately preceding such date or, if such date is the last day of a Fiscal Quarter, the period of four consecutive Fiscal Quarters ending on such date.

"Regulation D" means Regulation D of the Board of Governors of the Federal Reserve System as from time to time in effect and any successor thereto or other regulation or official interpretation of said Board of Governors relating to reserve requirements applicable to member banks of the Federal Reserve System.

"Regulation T" means Regulation T of the Board of Governors of the Federal Reserve System as from time to time in effect and any successor or other regulation or official interpretation of said Board of Governors relating to the extension of credit by banks for the purpose of purchasing or carrying margin stocks applicable to member banks of the Federal Reserve System.

"Regulation U" means Regulation U of the Board of Governors of the Federal Reserve System as from time to time in effect and any successor or other regulation or official interpretation of said Board of Governors relating to the extension of credit by banks for the purpose of purchasing or carrying margin stocks applicable to member banks of the Federal Reserve System.

"Regulation X" means Regulation X of the Board of Governors of the Federal Reserve System as from time to time in effect and any successor or other regulation or official interpretation of said Board of Governors relating to the extension of credit by banks for the purpose of purchasing or carrying margin stocks applicable to member banks of the Federal Reserve System.

"Reimbursed Expenses" means amounts paid by any Borrower to an Affiliate of such Borrower as reimbursement for Borrower's proportionate share of amounts paid by such Affiliate for operating expenses of Borrower.

"Reportable Event" means a reportable event as defined in Section 4043 of ERISA and the regulations issued under such section with respect to a Plan, excluding, however, such events as to which the PBGC by regulation waived the requirement of Section 4043(a) of ERISA that it be notified within 30 days of the occurrence of such event, provided, however, that a failure to meet the minimum funding standard of Section 412 of the Code and of Section 302 of ERISA shall be a Reportable Event regardless of the issuance of any waiver of such standard in accordance with either Section 302(c) of ERISA or Section 412(c) of the Code.

"Requirement of Law" means, as to any Person, the certificate or articles of incorporation or organization, by-laws, operating agreement, partnership agreement, trust agreement or other organizational or governing documents of such Person, and any law, treaty, rule or regulation or

determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"Restaurant" means any Sonic restaurant operated by any Borrower.

"Restricted Payment" means (i) any dividend or other distribution (whether in cash, notes, securities or other property) with respect to any Capital Stock of any Borrower or any Subsidiary, or (ii) any payment (whether in cash, notes, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any such Capital Stock in any Borrower or any option, warrant or other right to acquire any such Capital Stock in any Borrower and any payment on any note or other obligation constituting a Restricted Payment, or (iii) any fees, expenses and other monies due and payable, from time to time, by any Borrower or any of their respective Subsidiaries to any owner of any Borrower's Capital Stock or any of such owner's Affiliates, including any management or similar fees but excluding Reimbursed Expenses.

"Small Business Act" means the Small Business Act (15 U.S. Code Chapter 14A – Aid to Small Business).

"SBA" means the U.S. Small Business Administration.

"SBA PPP Loan" means a loan incurred by the Company under 15 U.S.C. 636(a)(36) (as added to the Small Business Act by Section 1102 of the CARES Act).

"SBA PPP Loan Date" means the date on which the Company received the proceeds of the SBA PPP Loan.

"Secured Obligations" means (a) the Obligations, (b) the Hedging Obligations, (c) the Banking Services Obligations, and (d) all other indebtedness, obligations and liabilities of any kind of any Loan Party to Lender or Lender's Affiliates, in all cases whether absolute or contingent and howsoever and whensoever created, arising, evidenced or acquired (including all renewals, extensions and modifications thereof and substitutions therefor and all interest accruing during any insolvency proceedings of any kind, whether or not an allowed claim); provided, however, that the definition of "Secured Obligations" shall not create any guarantee by any Guarantor of (or grant of security interest by any Guarantor to support, as applicable) any Excluded Swap Liability of such Guarantor for purposes of determining any obligations of any Guarantor.

"Security Documents" means each security agreement entered into by any Loan Party for the benefit of Lender pursuant to this Agreement and all other security and pledge agreements, pledge agreements, mortgages and other collateral documents delivered pursuant to this Agreement or otherwise entered into by any Person from time to time to secure the Secured Obligations, in each case in form and substance acceptable to Lender and as amended or modified from time to time.

"Sonic" means Sonic Restaurants, Inc.

"Subsidiary" means a corporation or other entity of whose shares of stock or other ownership interests having ordinary voting power (other than stock or other ownership interests having such power only by reason of the happening of a contingency) to elect a majority of the directors of such corporation, are owned, directly or indirectly, by any other Person. Unless otherwise specified, reference to "Subsidiary" means a Subsidiary of any Borrower.

"Tax Distributions" means all dividends, payments or other distributions in respect of any class of any Borrower's Capital Stock made solely to pay Pass-Through Tax Liabilities as and when due.

"Term Loan A" is defined in Section 2.1 of this Agreement.

"Term Loan" means Term Loan A.

"Total Funded Indebtedness" is defined in Section 5.3(c) of this Agreement.

"UCC" means the Uniform Commercial Code in effect in Michigan.

"Unfunded Benefit Liabilities" means, with respect to any Plan as of any date, the amount of the unfunded benefit liabilities determined in accordance with Section 4001(a)(18) of ERISA.

"U.S." means the United States of America (excluding any territories of the United States of America).

1.2. UCC Definitions; Other Definitions; Rules of Construction. All capitalized terms used herein with reference to the Collateral and defined in the UCC shall have the meaning given therein unless otherwise defined herein. To the extent the definition of any category or type of Collateral is expanded by any amendment, modification or revision to the UCC, such expanded definition will apply automatically as of the effective date of such amendment, modification or revision. As used herein, the terms "Lender", "Company", "Borrower", "Borrowers" and "this Agreement" shall have the respective meanings ascribed thereto in the introductory paragraph of this Agreement. Such terms, together with the other terms defined in Section 1.1, shall include both the singular and the plural forms thereof and shall be construed accordingly. Use of the terms "herein", "hereof", and "hereunder" shall be deemed references to this Agreement in its entirety and not to the Section or clause in which such term appears. References to "Sections" and "subsections" shall be to Sections and subsections, respectively, of this Agreement unless otherwise specifically provided.

1.3. Accounting Terms and Determinations.

(a) Whenever the term "Company" is used in respect of a financial covenant or a related definition, it shall be understood to mean Company and its Subsidiaries on a consolidated basis unless the context clearly requires otherwise. Except as otherwise expressly provided herein, all accounting terms used herein shall be interpreted, and all financial computations hereunder and all financial statements and certificates and reports as to financial matters required to be delivered to Lender hereunder shall (unless otherwise disclosed to Lender in writing at the time of delivery thereof in the manner described in subsection (b) below) be made and prepared, in accordance with GAAP provided that, if Company notifies Lender that it wishes to amend any covenant in Article 5 to eliminate the effect of any change in GAAP (or if Lender notifies Company that Lender wishes to amend Article 5 for such purpose), then Company's compliance with such covenants shall be determined on the basis of GAAP in effect immediately before the relevant change in GAAP became effective until either such notice is withdrawn or such covenant or any such defined term is amended in a manner satisfactory to the Company and Lender. Except as otherwise expressly provided herein, all references to a time of day shall be references to Eastern time. Notwithstanding anything herein, in any financial statements of the Company or in GAAP to the contrary, for purposes of calculating and determining compliance with the financial covenants in Section 5.3, including defined terms used therein, all acquisitions (to the extent permitted hereunder, if at all) shall be deemed to have occurred on the first day of the relevant period for which such financial covenants were calculated on a pro forma basis acceptable to the Lender.

(b) Company shall deliver to the Lender, at the same time as the delivery of any annual or quarterly financial statement under Section 5.1(d) hereof, (i) a description in reasonable detail of any material variation between the application or other modification of accounting principles employed in the preparation of such statement and the application or other modification of accounting principles employed in the preparation of the immediately prior annual or quarterly financial statements as to which no objection has been made in accordance with subsection (a) above and (ii) if requested by the Lender, reasonable estimates of the difference between such statements arising as a consequence thereof.

(c) If there occurs after the Effective Date any change in GAAP resulting from the implementation of Financial Accounting Standards Update Board Accounting Standards Topic 840 (Leases) that affects in any respect the calculation of any covenant contained in this Agreement or the definition of any term defined under GAAP used in such calculations, Company and Lender shall negotiate in good faith to amend the provisions of this Agreement that relate to the calculation of such covenants with the intent of having the respective positions of Company and Lender after such change in GAAP conform as nearly as possible to their respective positions as of the Effective Date, provided, that, until any such amendments have been agreed upon, the covenants in this Agreement shall be calculated as if no such change in GAAP had occurred and Company shall provide additional financial statements or supplements thereto, attachments to compliance certificates and/or calculations regarding financial covenants as Lender may reasonably require in order to provide the appropriate financial information required hereunder with respect to Company both reflecting any applicable changes in GAAP and as necessary to demonstrate compliance with the financial covenants before giving effect to the applicable changes in GAAP. Notwithstanding the foregoing, if Company and Lender are unable to agree on appropriate amendments within one year after the effective date of the changes in Financial Accounting Standards Update Board Accounting Standards Topic 840 (Leases), then all covenant calculations and definitions shall thereafter be computed in accordance with GAAP as so changed.

(d) To enable the ready and consistent determination of the calculations required under this Agreement, Company will not change the last day of its Fiscal Year, or the last day of each of the first three Fiscal Quarters in each of its Fiscal Years.

(e) Company agrees to take all necessary action, including without limitation obtaining any necessary acknowledgments or consents from Company's auditors as may be required under applicable law, to ensure that Lender may rely on the audited financial statements of Company and its Subsidiaries, including the audited financial statements delivered to Lender before and after the Effective Date.

## ARTICLE 2.
## THE COMMITMENT AND THE LOANS

2.1. Commitment of Lender; Term Loan A. Subject to the terms and conditions of this Agreement, Lender hereby agrees to make a term loan to Borrowers, on a joint and several basis, in the principal amount of $7,200,000 (the "Term Loan A") on the Effective Date, the proceeds of which shall be used to refinance all existing debt and to make the Buyout Reimbursement Payment. Acceptance of the proceeds of Term Loan A by Borrowers shall be deemed a representation and warranty by Borrowers to Lender that all conditions precedent to the making of Term Loan A specified in Sections 2.4 and 2.5 hereof are satisfied as of the date of the disbursement of Term Loan A.

2.2. Up-Front Fee. Borrowers agree to pay to Lender, as consideration for Lender's Commitment to make the Loans, a nonrefundable commitment fee equal to $25,200 (the "Up-front Fee").

2.3. Disbursement of Loans.

(a) Requesting Advances. Borrowers must request advances no later than 2:00 p.m. (Eastern time) on a Business Day, unless otherwise authorized under Lender's electronic banking platform. Advances shall be in a minimum amount of Fifty Thousand and 00/100 Dollars ($50,000) and in integral multiples in amounts acceptable to Lender.

(b) Disbursement of Loan Proceeds. Any prepayments on any Loan may not be reborrowed. The proceeds of the Loans requested by any Borrower shall be made available to the requesting Borrower on the day so requested by way of credit to such Borrower's operating account with Lender, as instructed by such Borrower, in immediately available funds.

(c) Evidence of Loan. All Loans shall be evidenced by the Notes, and the Loans shall be due and payable and bear interest as provided in Article 3. Lender is hereby authorized by each Borrower to record in its books and records, the date, amount and type of each Loan, the amount of each payment or prepayment of principal thereon, and the other information provided for on such schedule, which schedule or books and records, as the case may be, shall constitute prima facie evidence of the information so recorded; provided, however, that failure of Lender to record, or any error in recording, any such information shall not relieve any Borrower of its obligation to repay the outstanding principal amount of the Loans, all accrued interest thereon and other amounts payable with respect thereto in accordance with the terms of the Notes and this Agreement.

2.4. Conditions for the Initial Extension of Credit. The obligation of Lender to extend any credit hereunder is subject to receipt by Lender of the following documents and completion of the following matters, in form and substance satisfactory to Lender:

(a) Charter Documents. Certificates of recent date of the appropriate authority or official of each Loan Party's state of organization (listing all charter documents of each Loan Party on file in that office if such listing is available) and certifying as to the good standing and corporate existence of each Loan Party, together with copies of such charter documents and resolutions of each Loan Party, certified as of a recent date by such authority or official and certified as true and correct as of the Effective Date by a duly authorized officer of each Loan Party;

(b) Incumbency Certificate. Certificates of incumbency of each Loan Party containing, and attesting to the genuineness of, the signatures of those officers authorized to act on behalf of each Loan Party in connection with the Loan Documents and the consummation by each Loan Party of the transactions contemplated hereby, certified as true and correct as of the Effective Date by a duly authorized officer of each Loan Party;

(c) Notes. The Notes duly executed on behalf of Borrowers;

(d) Due Diligence, Etc. Completion of all due diligence satisfactory to Lender, including without limitation the completion of all lien and litigation searches, the completion of all collateral audits and other due diligence required by Lender, a review of all material debt agreements and other material agreements (including the Franchise Documents) and related documents required by Lender, and all other documents listed on any closing list delivered in connection with this agreement, all in form and substance satisfactory to Lender;

(e) Security Documents. The Security Documents duly executed on behalf of each Borrower granting to Lender a perfected security interest in the Collateral intended to be provided pursuant to Section 2.6, together with:

(i) Recording, Filing, Etc. Simultaneous with the execution of this Agreement, evidence of the recordation, filing and other action (including payment of any applicable taxes or fees) in such jurisdictions as Lender may deem necessary or appropriate with respect to the Security Documents, including the filing of financing statements and similar documents which Lender may deem necessary or appropriate to create, preserve or perfect the liens, security interests and other rights intended to be granted to Lender, together with UCC record searches in such offices as Lender may request;

(ii) Owned Real Property. All surveys, title insurance, flood zone certifications and other documents reasonably requested by Lender with respect to any real property owned by any Borrower (if any);

(iii) Leased Property Leases. Copies of the leases for all the locations identified on Schedule 4.23 hereto, certified as true and complete by a duly authorized officer of each Borrower; and

(iv) Casualty and Other Insurance. Evidence that the casualty and other insurance required by the Loan Documents is in full force and effect;

(f) Payoffs. Evidence satisfactory to Lender that all Indebtedness (other than Permitted Indebtedness) is paid in full simultaneously with the closing on the Effective Date and all Liens (other than Permitted Liens) in connection therewith are released and lines of credit terminated;

(g) Patriot Act Certificate. The Patriot Act Certificate duly executed by each Loan Party;

(h) KYC Information. Each Loan Party shall have delivered to Lender prior to the Effective Date such reasonable documentation (including, if applicable, a Beneficial Ownership Certification) and other information requested for purposes of compliance with applicable "know your customer" and anti-money laundering rules and regulations, including without limitation the Patriot Act;

(i) Franchise Certificate. A certificate for Borrowers dated the date of this Agreement signed by an appropriate representative of each Borrower (i) certifying that the Franchise Agreements with Sonic are in full force and effect, (ii) certifying that Borrower is a Sonic franchisee or licensee in good standing; (iii) identifying all locations of the Collateral, and (iv) certifying that no material default has occurred and is continuing under the Franchise Documents, all as of the date of this Agreement;

(j) Fees. Lender shall have received payment of the Up-front Fee and Borrower shall have paid all other fees and expenses required to be paid pursuant to this Agreement; and

(k) Miscellaneous. Such other certificates, documents, opinions of counsel, and the completion of such other matters, as Lender may reasonably request.

2.5. Further Conditions. The obligation of Lender to make any Loan is further subject to the satisfaction of the following conditions precedent:

(a) The representations and warranties contained in Article 4 hereof and in the other Loan Documents shall be true and correct in all material respects on and as of the date such Loan is made; and

(b) No Default or Event of Default shall exists or shall have occurred and be continuing on the date such Loan is made.

Each Borrower shall be deemed to have made a representation and warranty to Lender at the time of the making of each Loan to the effects set forth in clauses (a) and (b) of this Section 2.5. For purposes of this

Section 2.5, the representations and warranties contained in Section 4.6 hereof shall be deemed made with respect to both the financial statements referred to therein and the most recent financial statements delivered pursuant to Section 5.1(d)(ii) and (iii).

2.6. Security and Collateral. To secure or guarantee, as the case may be, the payment when due of the Secured Obligations, each Borrower shall execute and deliver, or cause to be executed and delivered, to Lender, Guaranties and the other Security Documents granting the following:

(a) A first priority security interest in, and lien on, all Collateral. Each Borrower shall be required to grant a first priority security interest in all Collateral.

(b) All other security and collateral described in the Security Documents.

Each Borrower shall promptly execute and deliver all Security Documents and such other agreements, certificates and other documents, reasonably requested by Lender from time to time to further evidence the grant of a perfected security interest in all Collateral and shall promptly cause the Guarantors to deliver all Guaranties and other Security Documents required hereunder from time to time, together with all organizational documents, resolutions, opinions and other documents reasonably required by Lender in connection therewith.

2.7. Joint and Several Obligations.

(a) Each Borrower acknowledges and agrees that Lender is entering into this Agreement and providing the Loans at the request of each Borrower and with the understanding that each Borrower is and shall remain fully liable, jointly and severally, for payment in full of the Loans provided to each Borrower. Each Borrower further agrees that it is receiving or will receive a direct or indirect pecuniary benefit for the Loans.

(b) Anything in this Agreement or any other Loan Document to the contrary notwithstanding, in no event shall the maximum liability of any Loan Party exceed the maximum amount that (after giving effect to the incurrence of the obligations hereunder and to any rights to contribution or other rights of such Loan Party from such other Loan Party) would not render the rights to payment of Lender hereunder void, voidable or avoidable under any applicable fraudulent transfer law or conveyance law.

(c) In the event that any obligation of any Loan Party under this Agreement or any Loan Document is deemed to be an agreement by such Loan Party to answer for the debt or default of another Loan Party or as an accommodation, maker or hypothecation of property as security therefor, each Loan Party represents and warrants that (i) no representation has been made to such Loan Party as to the creditworthiness of such other Loan Party, and (ii) such Loan Party has established adequate means of obtaining from such other Loan Party on a continuing basis, financial or other information pertaining to such other Loan Party's financial condition. Each Loan Party expressly waives, except as expressly required under this Agreement, diligence, demand, presentment, protest and notice of every kind and nature whatsoever (other than notices expressly required under this Agreement or any other Loan Document), consents to the taking by Lender of any additional security of another Loan Party for the Obligations, or the alteration or release in any manner of any security of another Loan Party now or hereafter held in connection with the Obligations, and consents that Lender and any other Loan Party may deal with each other in connection with such Obligations or otherwise, or alter any contracts now or hereafter existing between them, in any manner whatsoever, including without limitation the renewal, extension, acceleration or changes in time for payment of any such obligations or in the terms or conditions of any security held. Lender is hereby expressly given the right, at its option, to proceed in the

enforcement of any of the Obligations independently of any other remedy or security they may at any time hold in connection with such obligations secured, and it shall not be necessary for Lender to proceed upon or against or exhaust any other security or remedy before proceeding to enforce its rights against such Loan Party.

(d) Each Loan Party further agrees that it will not enforce any right of subrogation, reimbursement, exoneration, contribution, indemnification, setoff or other recourse in respect of sums paid to Lender by any other Loan Party with respect to any liability incurred by it hereunder or under any Loan Document, any payment made by it to Lender with respect to any of the Obligations or any collateral security therefor until such time as all of its respective Obligations are paid in full in cash. Any claim that any Loan Party may have against any other Loan Party with respect to any payments to Lender hereunder or under any other Loan Document are hereby expressly made subordinate and junior in right of payment, without limitation as to any increases in the Obligations arising hereunder or thereunder, to the prior payment in full in cash of all Obligations and, in the event of any insolvency proceeding relating to any Loan Party, its debts or its assets, whether voluntary or involuntary, all such Obligations shall be paid in full in cash before any payment or distribution of any character, whether in cash, securities or other property, shall be made to any other Loan Party therefor.

## ARTICLE 3.
## PAYMENTS AND PREPAYMENTS

3.1. Payments and Prepayments.

(a) Payments on Term Loan A. Borrowers shall pay, on a joint and several basis, interest to Lender on the unpaid principal amount of Term Loan A for the period commencing on the date Term Loan A is made until Term Loan A is paid in full, at the Loan Rate. On a joint and several basis, Borrowers agree to pay consecutive monthly installments in an amount equal to the sum of (A) principal in the amount of $60,000 plus (B) all accrued and unpaid interest, which installments shall be payable on the fifteenth (15) day of each month, commencing on January 15, 2021 and continuing until the Maturity Date. If not sooner paid, the outstanding principal balance of Term Loan A and all accrued and unpaid interest thereon shall be due and payable in full on the Maturity Date.

(b) Prepayments.

(i) Borrowers may at any time and from time to time prepay all or a portion of the Loans, without premium or penalty, other than any amount payable to Lender pursuant to clause (ii) below.

(ii) In the event that any prepayment of a Loan accruing interest at a variable rate based on a LIBO Rate is made on a date other than the last Business Day of then current LIBO Rate Interest Period with respect thereto, Borrowers shall indemnify Lender for any increase costs to Lender resulting from such prepayment.

(iii) All prepayments of Loans shall be applied to principal installments due on such Loan in the inverse order of maturity.

(c) Determination of Index. This Agreement expresses an initial interest rate and an initial index value to 2 places to the right of the decimal point. This expression is done solely for convenience. The reference sources for the index used by Lender, as stated in this Agreement, may actually quote the index on any given day to as many as 5 places to the right of the decimal point. Therefore, the actual

index value used to calculate the interest rate on and the amount of interest due under the Loans will be to 5 places to the right of the decimal point.

(d) Payment on Non-Business Day. If any payment hereunder is due on any Loan on a day that is not a Business Day, then payment will be due on the next Business Day; provided, however, that if the next Business Day occurs in the following calendar month, then the payment shall be due on the immediately preceding Business Day.

3.2. Posting and Application of Payments.

(a) All payments of principal, interest and other amounts payable hereunder, or under any of the other Loan Documents must be made to Lender at the principal office of Lender specified in this Agreement not later than 11:00 a.m. on the due date to ensure credit on the due date. Lender shall not be required to credit any Loan for the amount of any item of payment or other payment that is unsatisfactory to Lender. All credits shall be provisional, subject to verification and final settlement. Lender may charge the respective Loan for the amount of any item of payment or other payment that is returned to Lender unpaid or otherwise not collected. Each Borrower hereby authorizes Lender to charge its account with Lender in order to cause timely payment of amounts due hereunder to be made (subject to sufficient funds being available in such account for that purpose).

(b) At the time of making each such payment, Borrowers shall, subject to the other terms and conditions of this Agreement, specify to Lender the Loan or other obligation of Borrowers hereunder to which such payment is to be applied. In the event that Borrowers fail to so specify the relevant obligation Lender may apply such payments as it may determine in its sole discretion.

(c) Prior to an Event of Default under this Agreement, payments shall be applied first to interest, then to principal, then to any fees or other amounts due and owing to Lender in connection with the Secured Obligations. After an Event of Default under this Agreement, payments may be applied, at Lender's option, as follows: first to any collection costs or expenses (including reasonable attorneys' fees), then to any late charges or other fees owing under the Loan Documents, then to accrued interest, then to principal. To the extent that any Borrower makes a payment or Lender receives any payment or proceeds of the Collateral for any Borrower's benefit, which are subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, debtor in possession, receiver, custodian or any other party under any bankruptcy law, common law or equitable cause, then, to such extent, the Secured Obligations or part thereof intended to be satisfied shall be revived and continue as if such payment or proceeds had not been received by Lender.

3.3. No Setoff or Deduction. All payments of principal of and interest on the Loans and other amounts payable by Borrowers hereunder shall be made by Borrowers without setoff or counterclaim, and, subject to the next succeeding sentence, free and clear of, and without deduction or withholding for, or on account of, any present or future taxes, levies, imposts, duties, fees, assessments, or other charges of whatever nature, imposed by any Governmental Authority, or by any department, agency or other political subdivision or taxing authority. If any such taxes, levies, imposts, duties, fees, assessments or other charges are imposed, Borrowers will pay such additional amounts as may be necessary so that payment of principal of and interest on the Loans and other amounts payable hereunder, after withholding or deduction for or on account thereof, will not be less than any amount provided to be paid hereunder and, in any such case, Borrowers will furnish to Lender certified copies of all tax receipts evidencing the payment of such amounts within 45 days after the date any such payment is due pursuant to applicable law. If any payment is made by Borrowers pursuant to this Section 3.3 to or for the benefit of Lender and Lender thereafter obtains a credit against, or a relief for or repayment of any tax or other charge in respect of which such payment has been made, Lender shall promptly refund such amount to Borrowers. If

circumstances arise which result in an increase in the amount of any payment to be made to Lender or for its account pursuant to this Section 3.3, then, without in any way limiting, reducing or otherwise qualifying the obligations of Borrowers under this Section 3.3, Lender shall, in consultation with Borrowers and to the extent that it can do so without prejudice to its own position, take such reasonable steps as may be open to it to mitigate or avoid the effects of such circumstances, including the transfer of its Applicable Lending Office; provided that Lender shall be under no obligations to take any such action if, in Lender's bona fide opinion, to do so may have an adverse effect upon its business, operations or financial condition.

3.4. Computation of Interest.

(a) Interest on the unpaid principal balance of the Loans is computed on a 365/360 basis; that is, by applying the ratio of the interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding. Any reference in this Agreement to a "per annum" rate shall be based on a year of 360 days.

3.5. Additional Costs.

(a) If any Change in Law shall (i) affect the basis of taxation of payments to Lender of any amounts payable by any Borrower under this Agreement (other than taxes imposed on the overall net income of Lender by the jurisdiction, or by any political subdivision or taxing authority of any such jurisdiction, in which Lender, has its principal office), or (ii) shall impose, modify or deem applicable any reserve, special deposit or similar requirement against assets of, deposits with or for the account of, or credit extended by Lender, or (iii) shall impose any other condition with respect to this Agreement, the Loans, or the Notes, and the result of any of the foregoing is to increase the cost to Lender of making, funding or maintaining any Loan or to reduce the amount of any sum receivable by Lender thereon, then Borrowers shall pay to Lender from time to time, upon request by Lender on or within 180 days after any such increased cost or reduced sum receivable is incurred, additional amounts sufficient to compensate Lender for such increased cost or reduced sum receivable to the extent, in the case of the Loans, Lender is not compensated therefor in the computation of the interest rate applicable to the Loans. A certificate as to the amount of such increased cost or reduced sum receivable, submitted to Borrowers by Lender, shall be conclusive evidence, absent manifest error, of the correctness of such amount.

(b) If any Change in Law affects or would affect the amount of capital or liquidity required or expected to be maintained by Lender (or any corporation controlling Lender) and Lender reasonably determines that the amount of such capital or liquidity is increased by or based upon the existence of Lender's obligations hereunder and such increase has the effect of reducing the rate of return on Lender's (or such controlling corporation's) capital as a consequence of such obligations hereunder to a level below that which Lender (or such controlling corporation) could have achieved but for such circumstances (taking into consideration its policies with respect to capital adequacy), then Borrowers shall pay to Lender, from time to time, upon request by Lender within 180 days after any such additional amount is incurred, additional amounts sufficient to compensate Lender (or such controlling corporation) for any increase in the amount of capital and reduced rate of return which Lender reasonably determines to be allocable to the existence of Lender's obligations hereunder. A certificate as to the amount of such compensation, submitted to Borrowers by Lender, shall be conclusive evidence, absent manifest error, of the correctness of such amount.

3.6. LIBO Rate – Change in Law; Capital Adequacy; Loss.

(a) In the event that Lender reasonably determines that by reason of (a) any change arising after the date of this Agreement affecting the interbank eurocurrency market or affecting the position of

Lender with respect to such market, adequate and fair means do not exist for ascertaining the applicable interest rates by reference to which the LIBO Rate then being determined is to be fixed, (b) (1) any change arising after the date of this Agreement in any applicable law or governmental rule, regulation or order (or any interpretation thereof, including the introduction of any new law or governmental rule, regulation or order), or (2) any other circumstance affecting Lender or the interbank eurocurrency market (such as, but not limited to, official reserve requirements required by Regulation D of the Board of Governors of the Federal Reserve System), the LIBO Rate shall not represent the effective cost to Lender of funding or maintaining accruing interest based upon the LIBO Rate then, and in any such event, the accrual of interest based upon the LIBO Rate shall be suspended until Lender shall notify Borrowers that the circumstances causing such suspension no longer exist, and beginning on the date of such suspension, interest shall accrue at a variable rate of interest per annum, which shall change in the manner set forth below, equal to twenty-five (25) basis points above the Prime Commercial Rate.

(b) In the event that on any date Lender shall have reasonably determined that accruing interest hereunder based upon the LIBO Rate has become unlawful by compliance by Lender in good faith with any law, governmental rule, regulation or order, then, and in any such event, Lender shall promptly give notice thereof to Borrowers. In such case, when required by law, interest shall accrue hereunder at a variable rate of interest per annum, which shall change in the manner set forth below, equal to twenty-five (25) basis points above the Prime Commercial Rate.

As used herein, the "Prime Commercial Rate" means he rate established by the Lender from time to time based on its consideration of economic, money market, business and competitive factors, and it is not necessarily the Lender's most favored rate. Subject to any maximum or minimum interest rate limitation specified herein or by applicable law, any variable rate of interest on the obligation evidenced hereby shall change automatically without notice to the undersigned immediately with each change in the Prime Commercial Rate. The interest rate change will not occur more often than each Business Day. If the Prime Commercial Rate becomes unavailable, the Lender may designate a substitute index after notifying the Borrowers. Notwithstanding the foregoing, if the Prime Commercial Rate shall be less than 0.50%, such rate shall be deemed to be 0.50% for purposes of this Agreement.

3.7. Indemnification. If, due to (a) the introduction of or any change in or in the interpretation of any law or regulation, (b) the compliance with any guideline or request from any central bank or other public authority (whether or not having the force of law), or (c) the failure of any Borrower to pay any amount when required by the terms of this Agreement, there shall be any loss or increase in the cost to Lender of accruing interest on the Loans based upon the LIBO Rate, then Borrowers agree that Borrowers shall, from time to time, upon demand by Lender, pay to Lender additional amounts sufficient to compensate Lender for such loss or increased cost. A certificate as to the amount of such loss or increase cost, submitted to Borrowers by Lender, shall be conclusive evidence, absent manifest error, of the correctness of such amount.

3.8. Applicable Lending Office. Lender may make and book the Loans at any Applicable Lending Office(s) selected by Lender and Lender may change its Applicable Lending Office(s) from time to time. Lender may, by written notice to Borrowers, designate one or more Applicable Lending Offices which are to make and book the Loans and for whose account the Loan payments are to be made. All terms of this Agreement shall apply to any such Applicable Lending Office(s) and the Notes shall be deemed held by Lender for the benefit of such Applicable Lending Office.

3.9. LIBOR Transition. Notwithstanding anything to the contrary in this Agreement or any other Loan Document, following the occurrence of a LIBOR Transition Event, the Lender may amend this Agreement to replace the LIBO Rate with a Replacement Index and, from time to time, the Lender may amend this Agreement to make such technical, administrative or operational changes that the Lender

reasonably determines are appropriate to reflect the adoption of such Replacement Index and permit the administration thereof by the Lender. Any amendment pursuant to this Section shall become effective upon written notice thereof to the Borrowers, without any further action or consent of the Borrowers. As used in this Section:

"LIBOR Transition Event" means (1) a public statement or publication of information by or on behalf of the administrator of the London interbank offered rate incorporated into the LIBO Rate ("LIBOR") (or the U.S. Federal Reserve System or a regulatory supervisor, insolvency official, resolution authority, court or other entity with jurisdiction or authority over such administrator) that states that such administrator has ceased or will cease to provide LIBOR permanently or indefinitely; provided, that at such time there is no successor administrator that will continue to provide LIBOR or (2) a public statement or publication of information by the regulatory supervisor for the administrator of LIBOR announcing that LIBOR is no longer representative.

"Replacement Index" means the sum of: (x) the alternate index rate (which may be based on the Secured Overnight Financing Rate) that has been selected by the Lender and (y) the adjustment factor (which may be a positive or negative value or zero) that has been selected by the Lender; provided, that if the Replacement Index shall be less than 0.50%, such rate shall be deemed to be 0.50% for purposes of this Agreement. In making such selections, the Lender shall give due consideration to (i) any selection or recommendation by the Federal Reserve Board and/or the Federal Reserve Bank of New York (or a committee officially endorsed or convened thereby) or any successor thereto or (ii) any evolving or then-prevailing market convention for such rate or adjustment.

## ARTICLE 4.
## REPRESENTATIONS AND WARRANTIES

Each Borrower represents and warrants to Lender that:

4.1. Existence and Power. Each Borrower is a limited liability company duly organized, validly existing and in good standing under the laws of the state of its jurisdiction of incorporation or organization, as the case may be, and is duly qualified to do business, and is in good standing, in all additional jurisdictions where such qualification is necessary under applicable law except where the failure to be so qualified would not have a Material Adverse Effect. Each Borrower has all requisite power and authority, rights and franchises or licenses (as applicable) to own or lease the properties used in its business and to carry on its business as now being conducted and as proposed to be conducted, and to execute and deliver the Loan Documents and to engage in the transactions contemplated by the Loan Documents. Except as specifically set forth herein, each Borrower possesses all material permits, memberships, franchises or licenses (as applicable), contracts and licenses required and all trademark rights, trade name rights, patent rights, copyrights, and fictitious name rights necessary to enable it to conduct the business in which it is now engaged.

4.2. Authority. The execution, delivery and performance by each Borrower of the Loan Documents have been duly authorized by all necessary limited liability action and are not in material contravention of any law, rule or regulation, or any judgment, decree, writ, injunction, order or award of any arbitrator, court or Governmental Authority, or of the terms of Borrower's certificate of organization, operating agreement, or of any contract or undertaking to which Borrower is a party or by which Borrower or any of its property may be bound or affected (including the Franchise Documents) and will not result in the imposition of any Lien on any of its property except for Permitted Liens.

4.3. Binding Effect. The Loan Documents are the legal, valid and binding obligations of each Borrower enforceable against Borrowers in accordance with their respective terms.

4.4. Subsidiaries. As of the Effective Date, no Borrower has any Subsidiary. Each Borrower acknowledges and agrees that it will not form any Subsidiaries without the prior written consent of Lender, which consent shall not be unreasonably withheld. Each such Subsidiary and each corporation or limited liability company becoming a Subsidiary of any Borrower after the date hereof is and will be a corporation or limited liability company duly organized, validly existing and in good standing under the laws of its jurisdiction of incorporation or organization and is and will be duly qualified to do business in each additional jurisdiction where such qualification is or may be necessary under applicable law. Each Subsidiary of each Borrower has and will have all requisite corporate power to own or lease the properties used in its business and to carry on its business as now being conducted and as proposed to be conducted. All outstanding shares of Capital Stock of each class of each Subsidiary of each Borrower will be validly issued and will be fully paid and nonassessable and will be owned, beneficially and of record, by a Borrower or another Subsidiary of a Borrower free and clear of any Liens, except for Permitted Liens or as otherwise permitted pursuant to this Agreement.

4.5. Litigation. There is no action, suit or proceeding pending or, to the best of each Borrower's knowledge, threatened against or affecting any Loan Party before or by any court, Governmental Authority or arbitrator, which if adversely decided might have a Material Adverse Effect and, to the best of each Borrower's knowledge, there is no basis for any such action, suit or proceeding.

4.6. Financial Condition. The financial statements of Company delivered to Lender prior to the Effective Date fairly present the financial condition of Company and their Subsidiaries in accordance with GAAP as of the dates thereof. There has been no known event or development which has had or could reasonably be expected to have a Material Adverse Effect since the date of such financial statements. There is no material Contingent Liability of any Loan Party that is not reflected in such financial statements or in the notes thereto.

4.7. Use of the Loans. Borrowers will use the proceeds of the Term Loan to refinance all existing debt and to make the Buyout Reimbursement Payment. No Borrower extends or maintains, in the ordinary course of business, credit for the purpose, whether immediate, incidental, or ultimate, of buying or carrying Margin Stock, and no part of the proceeds of any Loan will be used for the purpose, whether immediate, incidental, or ultimate, of buying or carrying any Margin Stock or maintaining or extending credit to others for such purpose. After applying the proceeds of the Loans, Margin Stock will not constitute more than 25% of the value of the assets of any Borrower alone or Borrowers on a Consolidated basis that are subject to any provisions of any Loan Document that may cause the Loans to be deemed secured, directly or indirectly, by Margin Stock.

4.8. Consents, Etc. Except for those already obtained, no consent, approval or authorization of or declaration, registration or filing with any Governmental Authority or any nongovernmental Person or entity, including without limitation any creditor, lessor or stockholder of any Loan Party, is required on the part of any Loan Party in connection with the execution, delivery and performance of the Loan Documents or the transactions contemplated hereby or as a condition to the legality, validity or enforceability of the Loan Documents.

4.9. Taxes. Borrowers and their respective Subsidiaries have filed all tax returns (federal, state and local) required to be filed and have paid all taxes shown thereon to be due, including interest and penalties, or have established adequate financial reserves on their respective books and records for payment thereof in accordance with GAAP. No Borrower knows of any actual or proposed tax assessment or any basis therefor, and no extension of time for the assessment of deficiencies in any federal or state tax has been granted by any Borrower.

4.10. Title to Properties. Each Borrower or one or more of its Subsidiaries has a valid and indefeasible ownership interest in all of its properties and assets. As of the date hereof, all of such properties and assets are free and clear of any Lien, except for Permitted Liens. The Security Documents grant a first priority perfected security interest in all Collateral, and none of the Collateral is subject to any Lien other than Permitted Liens.

4.11. ERISA. No Borrower has created, maintains and is obligated to contribute to, any Plan or Multiemployer Plan.

4.12. Disclosure. No report or other information furnished in writing or on behalf of any Borrower or any Subsidiary to Lender in connection with the negotiation or administration of this Agreement contains any material misstatement of fact or omits to state any material fact or any fact necessary to make the statements contained therein not misleading in light of the circumstances in which they were made. Neither any Loan Documents nor any other document, certificate, or report or statement or other information furnished to Lender by or on behalf of any Borrower or any Subsidiary in connection with the transactions contemplated hereby contains any untrue statement of a material fact or omits to state a material fact in order to make the statements contained herein and therein not misleading in light of the circumstances in which they were made. There is no fact known to any Borrower which has or which in the future may have a Material Adverse Effect which has not been set forth in this Agreement or in the other documents, certificates, statements, reports and other information furnished in writing to Lender by or on behalf of any Borrower or any Subsidiary in connection with the transactions contemplated hereby.

4.13. Environmental Matters. Each Borrower and each of its Subsidiaries is in compliance with all Environmental Laws in jurisdictions in which such Borrower or any Subsidiary owns or operates, or has owned or operated, a facility or site, or arranges or has arranged for disposal or treatment of hazardous substances, solid waste, or other wastes, accepts or has accepted for transport any hazardous substances, solid wastes or other wastes or holds or has held any interest in real property or otherwise, except where such noncompliance would not reasonably be expected to result in a Material Adverse Effect. No demand, claim, notice, action, administrative proceeding, investigation or inquiry whether brought by any Governmental Authority, private Person or entity or otherwise, arising under, relating to or in connection with any Environmental Laws is pending or to any Borrower's knowledge threatened against any Borrower, any real property in which any Borrower holds or has held an interest or any past or present operation of any Borrower. Neither any Borrower nor any Subsidiary (a) is, to the best of its knowledge, the subject of any federal or state investigation evaluating whether any remedial action is needed to respond to a release of any Hazardous Materials into the environment, (b) has received any notice of any Hazardous Materials in, or upon any of its properties in violation of any Environmental Laws, (c) knows of any basis for any such investigation, notice or violation, or (d) owns or operates, or has owned or operated, property which appears on the United States National Priority List or any other governmental listing which identifies sites for remedial clean-up or investigatory actions. No release, threatened release or disposal of Hazardous Materials is occurring or has occurred on, under or to any real property in which any Borrower holds any interest or performs any of its operations, in violation of any Environmental Law.

4.14. No Default. Neither any Borrower nor any Subsidiary is in default or has received any written notice of default under or with respect to any of its Contractual Obligations (other than the Obligations) in any respect which could have a Material Adverse Effect. No Default or Event of Default has occurred and is continuing.

4.15. No Burdensome Restrictions. No Requirement of Law or Contractual Obligation applicable to any Borrower or any Subsidiary could have a Material Adverse Effect on the financial condition or business of Borrowers and their respective Subsidiaries taken as a whole.

4.16. Labor Matters. There are no strikes or other labor disputes against any Borrower or any Subsidiary pending or, to the knowledge of any Borrower, threatened that (individually or in the aggregate) could reasonably be expected to have a Material Adverse Effect. Hours worked by and payment made to employees of Borrowers and their respective Subsidiaries have not been in violation of the Fair Labor Standards Act, if applicable, or any other applicable Requirement of Law dealing with such matters that (individually or in the aggregate) could reasonably be expected to have a Material Adverse Effect. All payments due from Borrowers and their respective Subsidiaries on account of employee health and welfare insurance that (individually or in the aggregate) could reasonably be expected to have a Material Adverse Effect if not paid have been paid or accrued as a liability on the books of a Borrower or one of its Subsidiaries.

4.17. Solvency. (a) After giving effect to the transactions described herein and to the incurrence or assumption of any Indebtedness (including without limitation all dividends to be made, the Loans and all other obligations being incurred or assumed in connection herewith and therewith) (i) the fair value of the assets of each Borrower and its Subsidiaries, at a fair valuation, will exceed the debts and liabilities, subordinated, contingent or otherwise, of such Borrower and its Subsidiaries; (ii) the present fair saleable value of the property of each Borrower and its Subsidiaries will be greater than the amount that will be required to pay the probable liability of such Borrower and its Subsidiaries on its debts and other liabilities, subordinated, contingent or otherwise, as such debts and other liabilities become absolute and matured; (iii) each Borrower and its Subsidiaries will be able to pay their debts and liabilities, subordinated, contingent or otherwise, as such debts and liabilities become absolute and matured; and (iv) each Borrower and its Subsidiaries will not have unreasonably small capital with which to conduct the businesses in which it is engaged as such businesses are now conducted and are proposed to be conducted after the date hereof.

(b) No Borrower intends to, or permit any of its Subsidiaries to, and does not believe that it or any of its Subsidiaries will, incur debts beyond its ability to pay such debts as they mature, taking into account the timing of and amounts of cash to be received by it and the timing of the amounts of cash to be payable on or in respect of its Indebtedness.

4.18. Not an Investment Borrower; Other Regulations. Neither any Borrower nor any of its Subsidiaries is an "investment company" within the meaning of the Investment Borrower Act of 1940, as amended, nor subject to any regulation under any federal or state statute or regulation (except those applicable to corporations generally) which limits its ability to incur Indebtedness.

4.19. Intellectual Property. Each Borrower and its Subsidiaries owns, or is licensed to use, all trademarks, tradenames, service marks, copyrights, technology, know-how and processes necessary for the conduct of its business as currently conducted (the "Intellectual Property"). No claim has been asserted and is pending by any Person challenging or questioning the use of any such Intellectual Property or the validity or effectiveness of any such Intellectual Property, nor does any Borrower or any Subsidiary know of any valid basis for any such claim, the use of such Intellectual Property by any Borrower and its Subsidiaries does not infringe on the rights of any Person, and, to the knowledge of any Borrower or any Subsidiary, no Intellectual Property has been infringed, misappropriated or diluted by any other Person except for such claims, infringements, misappropriation and dilutions.

4.20. Anti-Terrorism Laws. No Loan Party has or will engage in or conspire to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, any of the prohibitions set forth in any Anti-Terrorism Law.

4.21. OSHA. Each Borrower and its Subsidiaries have duly complied with, and (i) its facilities, business, assets, and property, and (ii) to its knowledge, its leaseholds, are in compliance in all

material respects with, the provisions of the Federal Occupational Safety and Health Act, 29 U.S.C. Section 651, et seq., and the regulations and legally-binding policies promulgated pursuant thereto ("OSHA"); and no administrative or judicial actions or proceedings arising under OSHA are pending, or to the knowledge of any Borrower, threatened, against any Borrower or any Subsidiary relating to its facilities, business, assets, property, or leaseholds.

4.22. Franchise Documents. The Franchise Documents are in full force and effect, no material defaults thereunder by any Borrower have occurred and are continuing, and no notice of intent to either terminate or not renew the Franchise Documents has been received by any Borrower or any Subsidiary. Each Borrower and each Subsidiary have paid all franchise or license fees currently due and payable under the Franchise Documents and performed all other obligations of the franchisees under such Franchise Documents for all of the Restaurants. Each Borrower has delivered copies of all Franchise Agreements to Lender.

4.23. Leases. Each Borrower and its Subsidiaries have performed all of their obligations under all leases of real property on which the Restaurants are located and has not received any notice of default under any such lease. Each Borrower has delivered copies of all leases to Lender.

4.24. Beneficial Ownership Certificate. The Borrower represents that as of the Effective Date, the information included in the Beneficial Ownership Certification, if applicable, is true and correct in all respects.

## ARTICLE 5.
## COVENANTS

5.1. Affirmative Covenants. Each Borrower covenants and agrees that, until the Maturity Date and thereafter until payment in full of the Secured Obligations, unless Lender shall otherwise consent in writing in its reasonable discretion, it shall, and shall cause each of its Subsidiaries to:

(a) Preservation of Corporate Existence, Franchisee Standing, Etc. Do or cause to be done all things necessary to preserve, renew and keep in full force and effect its legal existence, and its qualification as a foreign corporation in good standing in each jurisdiction in which such qualification is necessary under applicable law except where failure to maintain such qualification would not result in a Material Adverse Effect; continue to be a franchisee or licensee of Sonic in good standing; do or cause to be done all things necessary to preserve, renew and keep in full force and effect all rights, licenses, permits (including those required under Environmental Laws), franchises, patents, copyrights, trademarks and trade names material to the conduct of its businesses; and defend all of the foregoing against all claims, actions, demands, suits or proceedings at law or in equity or by or before any Governmental Authority.

(b) Compliance with Laws, Etc. Comply in all material respects with all applicable laws, rules, regulations and orders of any Governmental Authority, whether federal, state, local or foreign (including without limitation ERISA, the Code and Environmental Laws), in effect from time to time, except where such noncompliance would not reasonably be expected to result in a Material Adverse Effect; and pay and discharge promptly when due all taxes, assessments and governmental charges or levies imposed upon it or upon its income, revenues or property, before the same shall become delinquent or in default, as well as all lawful claims for labor, materials and supplies or otherwise, which, if unpaid, might give rise to Liens (other than Permitted Liens) upon such properties or any portion thereof, except to the extent that payment of any of the foregoing is then being contested in good faith by appropriate legal proceedings and with respect to which adequate financial reserves have been established on the books and records of each Borrower in accordance with GAAP. Without limiting the foregoing, each

Borrower shall (i) prohibit any Person that is an Owner or officer from being listed on the Specially Designated Nationals and Blocked Person List or other similar lists maintained by the Office of Foreign Assets Control ("OFAC"), the Department of the Treasury or included in any Executive Orders, (ii) not permit the proceeds of any Loan or any other financial accommodation extended by Lender to be used in any way that violates any foreign asset control regulations of OFAC or other applicable law, (iii) comply with all applicable Bank Secrecy Act laws and regulations, as amended from time to time, and (iv) otherwise comply with the USA Patriot Act and Lender's related policies and procedures.

(c) Maintenance of Properties; Insurance. Maintain, preserve and protect all property that is material to the conduct of the business of any Loan Party and keep such property in good repair, working order and condition (ordinary wear and tear excepted) and from time to time make, or cause to be made all needful and proper repairs, renewals, additions, improvements and replacements thereto necessary in order that the business carried on in connection therewith may be properly conducted at all times in accordance with customary business practices for similar businesses; and maintain in full force and effect insurance with responsible and reputable insurance companies or associations in such amounts, on such terms and covering such risks, including fire and other risks insured against by extended coverage, as is usually carried by companies engaged in similar businesses and owning similar properties similarly situated and in accordance with the requirements of the Franchise Documents and maintain in full force and effect public liability insurance, insurance against claims for personal injury or death or property damage occurring in connection with any of its activities or any properties owned, occupied or controlled by it, in such amount as it shall reasonably deem necessary and in accordance with the requirements of the Franchise Documents, and maintain such other insurance as may be required by law or by the Franchise Documents or as may be reasonably requested by Lender for purposes of assuring compliance with this Section 5.1(c).

(d) Reporting Requirements. Furnish to Lender the following:

(i) Promptly and in any event within three (3) Business Days after becoming aware of the occurrence of (A) any Default or Event of Default, (B) the commencement of any litigation with Sonic or any other litigation involving any Loan Party which, if adversely decided, might result in a Material Adverse Effect, and any material developments therein, or (C) entering into any material contract or undertaking that is not entered into in the ordinary course of business or (D) any development in the business or affairs of any Loan Party which has resulted in or which is likely to result in a Material Adverse Effect, a statement of the president, chief executive officer or chief financial officer of each Borrower setting forth details of each such Default or Event of Default or such litigation, material contract or undertaking or development and the action which Borrowers have taken and propose to take with respect thereto;

(ii) As soon as available and in any event within 45 days after the end of each Fiscal Quarter, the balance sheet of the Company and its Subsidiaries as of the end of such Fiscal Quarter, and the related statements of income, retained earnings and cash flows for the period commencing at the end of the previous Fiscal Year and ending with the end of such Fiscal Quarter, prepared by the Company and setting forth in each case in comparative form the corresponding figures for the corresponding date or period of the preceding Fiscal Year, all in reasonable detail and duly certified (subject to year-end audit adjustments) by the president, chief executive officer, managing member or chief financial officer of the Company as having been prepared in accordance with GAAP;

(iii) As soon as available and in any event on or before May 31 of each year, a copy of the balance sheet of the Company and its Subsidiaries as of the end of each Fiscal Year and the related statements of income, retained earnings and changes in financial position of the Company and its Subsidiaries (including a break out of reporting by Restaurant, in form and detail satisfactory to Lender),

reviewed by independent certified public accountants selected by the Company and acceptable to Lender, without qualifications unacceptable to Lender;

(iv) Together with the financial statements delivered pursuant to Section 5.1(d)(ii) and (iii) above a Compliance Certificate of the president, chief executive officer, managing member or chief financial officer of the Company stating (A) that no Event of Default has occurred and is continuing or, if a Default or Event of Default has occurred and is continuing, a statement setting forth the details thereof and the action which the Company has taken and propose to take with respect thereto, and (B) that a computation (which computation shall accompany such certificate and shall be in reasonable detail) showing compliance with Section 5.3 hereof is in conformity with the terms of this Agreement;

(v) As soon as available and in any event within 45 days after the end of each Fiscal Year of the Company, a copy of the Company's detailed Consolidated annual budget (including projected statements of operations and capital expenditures) and forecast for the upcoming Fiscal Year;

(vi) By no later thirty (30) days of any allowable filing deadlines, copies of the Company's signed and dated state and federal income tax returns and all related schedules; and

(vii) Promptly, such other information respecting the business, properties, operations or condition, financial or otherwise, of any Loan Party as Lender may from time to time reasonably request.

(e) Accounting; Access to Records, Books, Etc. Maintain a system of accounting established and administered in accordance with sound business practices to permit preparation of financial statements in accordance with GAAP and to comply with the requirements of this Agreement and, at any reasonable time and from time to time upon five (5) Business Days prior written notice, (i) permit Lender or any agents or representatives thereof to examine and make copies of and abstracts from the records and books of account of, and visit the properties of, each of Borrowers and its Subsidiaries and to discuss the affairs, finances and accounts each of Borrowers and its Subsidiaries with its respective directors, officers, employees and independent auditors, and by this provision each Borrower hereby authorizes such Persons to discuss such affairs, finances and accounts with Lender, (ii) permit Lender or any of its agents or representatives to inspect the Restaurants upon reasonable notice and during normal business hours and conduct a comprehensive annual field audit of its books, records, properties and assets, at the expense of Borrowers, and (iii) permit Lender or any of its agents or representatives to conduct appraisals of the Collateral, at such intervals as Lender may reasonably require, at the expense of Borrower.

(f) Additional Collateral and Guaranties. Promptly (i) execute and deliver additional Security Documents after the request therefor by Lender, sufficient to grant to Lender liens and security interests in any after acquired property of the type described in Section 2.6 and Guaranties required under Section 2.6, and (ii) cause each Person becoming a Subsidiary of any Borrower from time to time to execute and deliver to Lender, promptly after such Person becomes a Subsidiary, a Guaranty and Security Documents, together with such organizational documents, resolutions, legal opinions and other documents requested by Lender, sufficient to grant to Lender the liens and security interests in all Collateral and such Guaranties. Each Borrower shall promptly notify Lender of the acquisition of any property by such Borrower that is not subject to the existing Security Documents, of the existence of any Person that is required to be a Guarantor hereunder but has not executed a Guaranty and any other event or condition that may require additional action of any nature in order to preserve the effectiveness and perfected status of the liens and security interests of Lender with respect to all Collateral.

(g) Collateral Access Agreement. Will, within sixty (60) days after the Effective Date, use commercially reasonable efforts to deliver Collateral Access Agreements signed by all parties with

respect to locations of Collateral as required by Lender and maintain such Collateral Access Agreements in effect at all times thereafter.

(h) Further Assurances. Will execute and deliver promptly after the request therefor by Lender, all further instruments and documents and take all further action that may be necessary or desirable, or that Lender may request, in order to give effect to, and to aid in the exercise and enforcement of the rights and remedies of Lender under the Loan Documents.

(i) Bank Accounts. Within six (6) months after the Effective Date, maintain each Borrower's primary deposit account with the Lender and provide for sweeps to such primary deposit account from all other local Restaurant deposit accounts of any Borrower at regular intervals satisfactory to the Lender; provided, that, if all primary accounts are not moved to the Lender within six (6) months after the Effective Date, the Borrowers shall, within thirty (30) days thereafter, provide to the Lender a deposit account control agreement, in form and substance satisfactory to the Lender, duly executed on behalf of each financial institution holding a primary deposit account of a Borrower.

(j) ERISA. Shall with respect to any Plan or Multiemployer Plan, as such terms are defined in Sections 3(2), 3(37) and 4001(a)(3) of ERISA:

(i) at all times make prompt payment of contributions required to meet the minimum funding standards set forth in Section 302 through 305 of the ERISA;

(ii) promptly, after the filing thereof, furnish to the Lender copies of each annual report required to be filed pursuant to Section 103 of ERISA for the plan year, including any certified financial statements or actuarial statements required pursuant to said Section 103;

(iii) notify the Lender immediately of any fact, including, but not limited to, any "Reportable Event," as that term is defined in Section 4043 of ERISA, arising in connection with Borrower's Plan which might constitute grounds for termination thereof by the Pension Benefit Guaranty Corporation or for the appointment by the appropriate United States District Court of a Trustee to administer Borrower's Plan; and

(iv) notify Lender of the occurrence of any "Prohibited Transaction", as that term is defined in Section 406 of ERISA.

(k) Compliance with Franchise Documents. Duly observe, conform and comply in all material respects with each of the obligations imposed on it in each of the Franchise Documents. Borrowers will cause any Franchise Agreement that would otherwise expire prior to the Maturity Date to be extended, for an additional term satisfactory to Lender, at least thirty (30) days prior to the respective Franchise Agreement expiration date.

(l) Required Hedging Contracts. Within thirty (60) days of the Effective Date, Borrowers will enter into and maintain one or more of the transactions described in the definition of "Hedging Contracts" with one or more financial institutions acceptable to Lender in its reasonable discretion providing for a fixed rate of interest on not less than 50% of the principal amount of the Term Loan on terms acceptable to Lender.

(m) Beneficial Ownership Certificate and Other Additional Information. Promptly provide information and documentation reasonably requested by the Lender for purposes of compliance with applicable "know your customer" and anti-money-laundering rules and regulations, including, without limitation, the Patriot Act and the Beneficial Ownership Regulation, if applicable.

(n) SBA PPP Loans. (i) Use commercially reasonable efforts to (A) use all of the proceeds of the SBA PPP Loan exclusively for CARES Forgivable Uses in the manner required under the CARES Act to obtain forgiveness of the largest possible amount of the SBA PPP Loan, which as of the date hereof requires that the Company uses not less than 60% of the SBA PPP Loan proceeds for CARES Payroll Costs and (B) conduct their business in a manner that maximizes the amount of the SBA PPP Loan that is forgiven; and

(ii) (A) maintain all records required to be submitted in connection with the forgiveness of the SBA PPP Loan, (B) apply for forgiveness of the SBA PPP Loan in accordance with regulations implementing Section 1106 of the CARES Act within 30 days after the last day of the 24-week period immediately following the SBA PPP Loan Date and (C) provide the Lender with a copy of its application for forgiveness and all supporting documentation required by the SBA or the SBA PPP Loan lender in connection with the forgiveness of the SBA PPP Loan and with all other documents reasonably requested by the Lender with respect to the eligibility and status of the forgiveness of the SBA PPP Loan.

5.2. Negative Covenants. Until the Maturity Date, and thereafter until payment in full of the Secured Obligations, each Borrower agrees that, unless Lender shall otherwise consent in writing in its reasonable discretion, it shall not, and shall not permit any of its Subsidiaries to:

(a) Indebtedness. Create, incur, assume or in any manner become liable in respect of, or suffer to exist any Indebtedness other than:

(i) The Secured Obligations;

(ii) Trade accounts payable and accrued expenses arising in the ordinary course which are past due in an amount which is not material in the aggregate for Borrowers and their respective Subsidiaries;

(iii) Contingent Liabilities resulting from the endorsement of instruments for collection in the ordinary course of business;

(iv) Indebtedness secured by Permitted Liens (including any extensions or renewals thereof);

(v) Unsecured SBA PPP Loans, subject to the terms hereof; and

(vi) Indebtedness not otherwise permitted by this Section 5.2(a) incurred or assumed for the purpose of financing all or any part of the cost of acquiring or installing any fixed asset (including without limitation through Capital Leases), in an aggregate principal amount at any time outstanding not greater than $150,000.

(b) Liens. Create, incur or suffer to exist any Lien on any of its assets, rights, revenues or property, real, personal or mixed, tangible or intangible, whether now owned or hereafter acquired, other than:

(i) Liens for taxes not delinquent or for taxes being contested in good faith by appropriate proceedings and as to which adequate financial reserves have been established on its books and records;

(ii) Liens (other than any Lien imposed by ERISA) created and maintained in the ordinary course of business which are not material in the aggregate, and which would not have a Material

Adverse Effect and which constitute (A) pledges or deposits under worker's compensation laws, unemployment insurance laws or similar legislation, (B) good faith deposits in connection with bids, tenders, contracts or leases to which any Loan Party is a party for a purpose other than borrowing money or obtaining credit, including rent security deposits, (C) Liens imposed by law, such as those of landlords, carriers, warehousemen and mechanics, if payment of the obligation secured thereby is not yet due or which are being contested in good faith by appropriate legal proceedings and with respect to which adequate financial reserves have been established on the books and records of a Borrower, (D) liens securing taxes, assessments or other governmental charges or levies not yet subject to penalties for nonpayment, and (E) pledges or deposits to secure public or statutory obligations of any Loan Party, or surety, customs or appeal bonds to which any Loan Party is a party;

(iii) Liens affecting real property which constitute minor survey exceptions or defects or irregularities in title, minor encumbrances, easements or reservations of, or rights of others for, rights of way, sewers, electric lines, telegraph and telephone lines and other similar purposes, or zoning or other restrictions as to the use of such real property, provided that all of the foregoing, in the aggregate, do not at any time materially detract from the value of said properties or materially impair their use in the operation of the businesses of any Loan Party;

(iv) Any interest or title of a lessor, licensor, sublessor or sublicensor under any lease or license permitted by this Agreement;

(v) Liens in favor of collecting banks arising under Section 4-210 of the UCC;

(vi) Banker's Liens, rights of setoff and other similar Liens that are customary in the banking industry and existing solely with respect to cash and other amounts on deposit in one or more accounts (including securities accounts) maintained by Borrower or its Subsidiaries;

(vii) Liens incurred to secure surety bonds, supersedes bonds, or other instruments serving a similar purpose in connection with the appeal of any such judgment;

(viii) Any Lien created to secure payment of a portion of the purchase price of, or existing at the time of acquisition of, any tangible fixed asset acquired by any Borrower or any Subsidiary may be created or suffered to exist upon such fixed asset if the outstanding principal amount of the Indebtedness secured by such Lien does not at any time exceed the purchase price paid by such Borrower or such Subsidiary for such fixed asset, provided that (A) such Lien does not encumber any other asset at any time owned by such Borrower or such Subsidiary, (B) not more than one such Lien shall encumber such fixed asset at any one time and (C) the aggregate amount of Indebtedness secured by all such Liens does not exceed the amount permitted by Section 5.2(a)(v); and

(ix) Liens held by Lender.

(c) <u>Merger; Acquisitions; Etc</u>. Merge or consolidate or amalgamate with any other Person or take any other action having a similar effect nor enter into any joint venture or similar arrangement with any other Person, nor make any acquisition of any Person; provided, that any Subsidiary may merge into its parent Borrower with such Borrower as the surviving entity.

(d) <u>Disposition of Assets; Etc</u>. Except for: (i) Collateral that is worn out and replaced in the ordinary course of business or any Restaurant remodeling; (ii) sales of Inventory in the ordinary course of business, sell, lease, license, transfer, assign or otherwise dispose of any of its business, assets, rights, revenues or property, real, personal or mixed, tangible or intangible, whether in one or a series of transactions, other than any such sale, lease, license, transfer, assignment or other disposition if the

aggregate net book value (disregarding any write-downs of such book value other than ordinary depreciation and amortization) of all of the business, assets, rights, revenues and property disposed of in any Fiscal Year of Borrowers shall be less than $100,000 in aggregate amount and if, immediately before and after such transaction, no Event of Default shall exist or shall have occurred and be continuing.

(e) Nature of Business. Make any material change in the nature of its business from that engaged in on the date of this Agreement or engage in any other businesses other than those in which it is engaged on the date of this Agreement.

(f) Restricted Payments. Make, pay, declare or authorize any Restricted Payment other than: (i) such Restricted Payments constituting Tax Distributions; (ii) Restricted Payments paid by any Subsidiary to any Borrower; and (iii) other Restricted Payments (including management fees not to exceed two percent of aggregate net sales of Borrower in any calendar year) so long as both before and after giving pro forma effect to the payment of such Restricted Payment, no Event of Default shall have occurred and be continuing. No Borrower will issue any Disqualified Stock.

(g) Limitations on Restrictive Agreements. Except for agreement evidencing Permitted Indebtedness, (i) enter into any agreement with any person other than Lender which prohibits or limits the ability of any Borrower or any Subsidiary to create, incur, assume or suffer to exist any Lien (other than Permitted Liens) upon any of its assets, rights, revenues or property, real, personal or mixed, tangible or intangible, whether now owned or hereafter acquired; or (ii) enter into, or suffer to exist, any agreement with any Person which in any way restricts or limits the ability of any Borrower or any Subsidiary to amend, modify, supplement or otherwise alter the terms applicable to the Secured Obligations or this Agreement;

(h) Investments, Loans and Advances. Purchase or otherwise acquire any Capital Stock of or other ownership interest in, or debt securities of or other evidences of Indebtedness of, any other Person; nor make any loan or advance of any of its funds or property or make any other extension of credit to, or make any investment or acquire any interest whatsoever in, any other Person; nor incur any Contingent Liability; other than (i) extensions of trade credit made in the ordinary course of business on customary credit terms and commission, travel and similar advances made to officers and employees in the ordinary course of business, (ii) commercial paper of any United States issuer having the highest rating then given by Moody's Investors Service, Inc., or Standard & Poor's Corporation, direct obligations of and obligations fully guaranteed by the U.S. or any agency or instrumentality thereof, or certificates of deposit of any commercial bank which is a member of the Federal Reserve System and which has capital, surplus and undivided profit (as shown on its most recently published statement of condition) aggregating not less than $100,000,000; provided, however, that each of the foregoing investments has a maturity date not later than one year after the acquisition thereof by any Loan Party; and (iii) payment of Reimbursed Expenses.

(i) Transactions with Affiliates. Enter into, become a party to, or become liable in respect of, any contract or undertaking with any Affiliate except in the ordinary course of business and on "market" terms; provided, that, for avoidance of doubt, Borrowers may make payments of Reimbursed Expenses.

(j) Inconsistent Agreements. Enter into any agreement containing any provision which would be violated or breached by this Agreement or any of the transactions contemplated hereby or by performance by any Loan Party of its obligations in connection therewith.

(k) Transactions with Blocked Persons. Has not and shall not, at any time directly or indirectly, whether through itself, its Affiliates, or agents, (a) engage in any transaction with any Blocked

Person, (b) engage in any transaction that violates federal or state sanctions laws, such as those issued by the Office of Foreign Asset Control; (c) engage in or conspire to engage in any transaction that evades or avoids any of the prohibitions set forth in (a) and (b); or (d) fail to provide to the Lender any information requested from time to time by the Lender in its sole discretion, confirming the compliance of the Borrower with this section.

(l) Hedging Contracts. Neither any Borrower nor any Subsidiary is currently a party to, nor will it be a party to any Hedging Contract other than Hedging Contracts with Lender and other Hedging Contracts entered into in order to effectively hedge or mitigate risks to which any Borrower or any Subsidiary has actual exposure.

(m) Fiscal Year and Accounting Changes. Change its Fiscal Year or make any change (i) in accounting treatment and reporting practices except as required by GAAP, or (ii) in tax reporting treatment except as required by applicable law.

(n) Amendment of Organizational Documents. Amend, modify or waive any term or provision of its organizational documents unless (i) required by applicable law or with Lender's prior written consent (which shall not be unreasonably withheld, delayed or conditioned), (ii) Borrowers give Lender 30 Business Days' prior written notice, and (iii) before the change is effective, Borrowers take such action as Lender may request with respect to each change.

(o) Prepayment of Indebtedness. At any time, directly or indirectly, prepay any Indebtedness (other than to Lender), or repurchase, redeem, retire or otherwise acquire any Indebtedness of any Borrower or any Subsidiary.

(p) Restaurants. During the term of this Agreement, Borrowers will not close more than two (2) Restaurant without Lender's prior written consent (which shall not be unreasonably withheld, delayed or conditioned), other than Stores #3933 and #4117 which may be closed without Lender's consent and which are not counted against the two (2) closures otherwise permitted in this section; provided, that, in connection with any store closure, the Lender may, in its discretion, require a prepayment of the Loan in an amount required to maintain a neutral impact on the Consolidated Lease Adjusted Leverage Ratio.

(q) ERISA.

(i) intentionally engage in any "Prohibited Transaction";

(ii) permit any Plan to be determined to be in "at-risk" status, as defined in Section 303(i)(4) of ERISA or Section 430(i)(4) of the Internal Revenue Code of 1986, as the same may be amended or supplemented from time to time, and any successor statute of similar import and the rules and regulations promulgated thereunder as from time to time in effect; or

(iii) intentionally terminate any Plan in a manner which could result in the imposition of a lien on the property of Borrower pursuant to Part 4068 of ERISA..

5.3. Financial Covenants. Until the Maturity Date, and thereafter until payment in full of the Secured Obligations, Borrowers agree that, unless Lender shall otherwise consent in writing:

(a) Consolidated Fixed Charge Coverage Ratio (Pre-Distribution). Borrowers will not permit or suffer the ratio of (i) an amount equal to Consolidated EBITDAR, to (ii) Consolidated Fixed Charges, as calculated at the end of each Fiscal Quarter for the most-recently ended Reference Period, commencing with the Fiscal Quarter ending December 31, 2020, to be less than 1.25 to 1.00.

"Consolidated EBITDA" shall mean, for any Reference Period, (a) the sum of the amounts for such Reference Period of (i) Consolidated net income after taxes income, (ii) interest expense, (iii) charges for federal, state, local and foreign income taxes, (iv) depreciation, amortization expense and non-cash charges that were deducted in determining net income, and (v) extraordinary non-cash losses acceptable to Lender; *minus* (b) the sum of the amounts for such Reference Period of (i) extraordinary non-cash gains and (ii) to the extent not deducted from total interest expense, any net payments received during such Reference Period under interest rate "hedging" agreements and any interest income received in respect of cash investments.

"Consolidated EBITDAR" shall mean the EBITDAR of the Company and its Subsidiaries on a Consolidated basis, and "EBITDAR" shall mean, for any Reference Period, the sum of (a) Consolidated EBITDA for such Reference Period plus (b) rent and lease expense for such Reference Period.

"Consolidated Fixed Charges" shall mean, for any Reference Period, the sum of: (i) interest expense, (ii) rents and other amounts payable under operating leases, (iii) scheduled principal payments on capitalized leases, and (iv) scheduled principal payments on amortizing long-term debt, all calculated on a Consolidated basis for the Company and its Subsidiaries.

(b) Consolidated Fixed Charge Coverage Ratio (Post-Distribution). Borrowers will not permit or suffer the ratio of (i) an amount equal to Consolidated EBITDAR minus Restricted Payments, to (ii) Consolidated Fixed Charges, as calculated at the end of each Fiscal Quarter for the most-recently ended Reference Period, commencing with the Fiscal Quarter ending December 31, 2020, to be less than 1.10 to 1.00. Notwithstanding anything to the contrary in this Agreement, Lender agrees that the Buyout Reimbursement Payment shall not be deducted under clause (i) above as a Restricted Payment.

(c) Consolidated Lease Adjusted Leverage Ratio. Borrowers will not permit or suffer the ratio of (i) Consolidated Lease-Adjusted Total Funded Indebtedness to (ii) Consolidated EBITDAR (as defined above) (the "Consolidated Lease Adjusted Leverage Ratio"), as calculated at the end of each Fiscal Quarter for the most-recently ended Reference Period, commencing with the Fiscal Quarter ending December 31, 2020, to be greater than (i) commencing with the Fiscal Quarter ending December 31, 2020 through the Fiscal Quarter ending September 30, 2021, 5.50 to 1.0, and (ii) commencing with the Fiscal Quarter ending December 31, 2021 and thereafter, 5.25 to 1.0.

"Consolidated Lease-Adjusted Total Funded Indebtedness" shall mean the sum of (i) Total Funded Indebtedness as of the date of determination plus (ii) the product of (a) rent and lease expense paid in cash on a Consolidated basis for the Reference Period ending as of the date of determination multiplied by (b) a factor of (8), all calculated on a Consolidated basis for the Company and its Subsidiaries.

"Total Funded Indebtedness" shall mean, as of any date of determination, the aggregate of (i) all current and long-term debt, including all Indebtedness to Lender under the terms of this Agreement, and (ii) all current and long-term obligations under capitalized leases; provided, however, that SBA PPP Loans, to the extent forgivable and if the Borrowers are in compliance with Section 5.1(n) hereof, shall be excluded from Total Funded Indebtedness; provided, further, that the unforgiven portion of the SBA PPP Loan will not be so excluded and will be deemed to have been incurred as of the date such portion is determined not to be forgivable.

The Lease Adjusted Leverage Ratio shall also include a new unit adjustment, whereby funded debt related to new units (if applicable) open for less than 12 months is reduced based upon the amount of months that store has been open in the previous 12 month period.

## ARTICLE 6.
## DEFAULT

6.1. Events of Default. The occurrence of any one of the following events or conditions shall be deemed an "Event of Default" hereunder unless waived pursuant to Section 7.1:

(a) Nonpayment. Any Borrower shall fail to pay when due any principal of any Loan; or any Borrower shall fail to pay within three (3) Business Days of when due any interest on any Loan or any fees or any other amount payable under any of the Loan Documents; or any Borrower or any other Loan Party shall fail to pay any other Indebtedness owing to Lender;

(b) Misrepresentation. Any representation or warranty made by any Loan Party in any Loan Document or any other certificate, report, financial statement or other document furnished by or on behalf of any Loan Party in connection with this Agreement, shall prove to have been incorrect in any material respect when made or deemed made;

(c) Certain Covenants. Any Borrower shall fail to perform or observe any term, covenant or agreement contained in Sections 5.1(c), (d), (e) or (j) hereof, or Section 5.1(k) hereof (after giving effect to any applicable cure periods contained in the Franchise Documents) or Sections 5.2 or 5.3 hereof;

(d) Other Defaults. Any Loan Party shall fail to perform or observe any other term, covenant or agreement contained in this Agreement or in any other Loan Document, and any such failure shall remain unremedied for ten (10) calendar days;

(e) Cross Default. Any Loan Party shall fail to pay any part of the principal of, the premium, if any, or the interest on, or any other payment of money due under any of its Indebtedness (other than Obligations hereunder), beyond any period of grace and/or cure provided with respect thereto, which (other than Indebtedness to Lender) individually or together with other such Indebtedness as to which any such failure exists has an aggregate outstanding principal amount in excess of $100,000; or if any Loan Party fails to perform or observe any other term, covenant or agreement contained in, or if any other event or condition occurs or exists under, any agreement, document or instrument evidencing or securing any such Indebtedness having such aggregate outstanding principal amount, or under which any such Indebtedness was incurred, issued or created, beyond any period of grace and/or cure, if any, provided with respect thereto if the effect of such failure is either (i) to cause, or permit the holders of such Indebtedness (or a trustee on behalf of such holders) to cause, any payment in respect of such Indebtedness to become due prior to its due date or (ii) to permit the holders of such Indebtedness (or a trustee on behalf of such holders) to elect a majority of the Board of Directors of any Borrower;

(f) Litigation; Judgments. Any material litigation against any Borrower or any Subsidiary shall be initiated by Sonic and not dismissed within thirty (30) days; or any one or more judgments or orders for the payment of money in an aggregate amount of $100,000 shall be rendered against any Loan Party, or any other judgment or order (whether or not for the payment of money) shall be rendered against or shall affect any Loan Party which causes or could cause a Material Adverse Change in the business, properties, operations or condition, financial or otherwise, of such Loan Party or which does or could have a Material Adverse Effect and either (i) such judgment or order shall have remained unsatisfied and such Loan Party shall not have taken action necessary to stay enforcement thereof by reason of pending appeal or otherwise, prior to the expiration of the applicable period of limitations for taking such action or, if such action shall have been taken, a final order denying such stay shall have been rendered, or (ii) enforcement proceedings shall have been commenced by any creditor upon any such judgment or order;

(g) Franchise Agreements. An event of default shall have occurred under any Franchise Agreement and is continuing at the expiration of any applicable notice and/or cure period provided therein or any Franchise Agreement shall have been terminated or not renewed for any reason without the prior written consent of Lender or any Borrower or any Subsidiary shall have been notified that Sonic intends to either terminate or not renew its franchise or license;

(h) ERISA. The occurrence of a Reportable Event that results in or could result in liability greater than $100,000 of any Borrower or its ERISA Affiliates to the PBGC or to any Plan and such Reportable Event is not corrected within thirty (30) days after the occurrence thereof; or the occurrence of any Reportable Event which could constitute grounds for termination of any Plan of any Borrower or its ERISA Affiliates by the PBGC or for the appointment by the appropriate U.S. District Court of a trustee to administer any such Plan and such Reportable Event is not corrected within thirty (30) days after the occurrence thereof; or the filing by any Borrower or any of its ERISA Affiliates of a notice of intent to terminate a Plan or the institution of other proceedings to terminate a Plan; or any Borrower or any of its ERISA Affiliates shall fail to pay when due any liability to the PBGC or to a Plan; or the PBGC shall have instituted proceedings to terminate, or to cause a trustee to be appointed to administer, any Plan of any Borrower or any of its ERISA Affiliates; or any Person engages in a Prohibited Transaction with respect to any Plan which results in or could result in liability of any Borrower or any of its ERISA Affiliates, any Plan of any Borrower or any of its ERISA Affiliates or fiduciary of any such Plan; or failure by any Borrower or any of its ERISA Affiliates to make a required installment or other payment to any Plan within the meaning of Section 302(f) of ERISA or Section 412(n) of the Code that results in or could result in liability of any Borrower or any of its ERISA Affiliates to the PBGC or any Plan; or the withdrawal of any Borrower or any of its ERISA Affiliates from a Plan during a plan year in which it was a "substantial employer" as defined in Section 4001(9a)(2) of ERISA; or any Borrower or any of its ERISA Affiliates becomes an employer with respect to any Multiemployer Plan without the prior written consent of Lender;

(i) Insolvency, Etc. Any Loan Party shall be dissolved or liquidated (or any judgment, order or decree therefor shall be entered), or shall generally not pay its debts as they become due, or shall admit in writing its inability to pay its debts generally, or shall make a general assignment for the benefit of creditors, or shall institute, or there shall be instituted against any Loan Party any proceeding or case seeking to adjudicate it a bankrupt or insolvent or seeking liquidation, winding up, reorganization, arrangement, adjustment, protection, relief or composition of it or its debts under any law relating to bankruptcy, insolvency or reorganization or relief or protection of debtors or seeking the entry of an order for relief, or the appointment of a receiver, trustee, custodian or other similar official for it or for any substantial part of its assets, rights, revenues or property, and, if such proceeding is instituted against an Loan Party and is being contested by such Loan Party as the case may be, in good faith by appropriate proceedings, such proceeding shall remain undismissed or unstayed for a period of 60 days; or any Loan Party shall take any action (corporate or other) to authorize any of the actions described above in this subsection;

(j) Loan Documents. Any event of default described in any Loan Document shall have occurred and be continuing, or any material provision of any Loan Document shall at any time for any reason cease to be valid and binding and enforceable against any obligor thereunder, or the validity, binding effect or enforceability thereof shall be contested by any Person, or any Loan Party shall deny that it has any or further liability or obligation thereunder, or any Security Document shall fail or cease to create a valid and perfected and (except to the extent permitted by Section 5.2(b)) first priority Lien in favor of Lender on any Collateral purported to be covered thereby, or any Loan Document shall be terminated, invalidated or set aside, or be declared ineffective or inoperative or in any way cease to give or provide to Lender the benefits purported to be created thereby, or the Secured Obligations shall for any reason shall not have the priority contemplated by this Agreement or such subordination provisions;

(k) Hedging Contracts. Any Borrower or any Subsidiary fails to comply with or to perform any term, obligation, covenant or condition contained in or the occurrence or existence of any event of default, termination event or other similar event under or with respect to any Hedging Contract;

(l) Change in Control. Any Change in Control shall occur that is not approved by Lender prior to the Change in Control; or

(m) Material Adverse Change. Lender reasonably determines that a material adverse change has occurred with respect to (a) any Borrower's financial condition, results of operations, business or prospects, (b) any Borrower's ability to pay the Loans in accordance with the terms thereof, or (c) the value of the Collateral, or the priority of Lender's lien on any Collateral.

6.2. Remedies.

(a) Upon the occurrence and during the continuance of any Event of Default, Lender may by written notice to Borrowers declare the outstanding principal of, and accrued interest on, the Loans and the Notes, and all other amounts owing under this Agreement to be immediately due and payable, or any one or more of the foregoing, provided that, in the case of any event or condition described in Section 6.1(i) with respect to any Borrower, and all such amounts shall automatically become immediately due and payable, in each case without demand, presentment, protest, diligence, notice of dishonor or other formality, all of which are hereby expressly waived. All payments from Borrowers on the Secured Obligations and all payments on the Secured Obligations from any proceeds of any Collateral after the occurrence and during the continuance of any Event of Default shall be applied to the Secured Obligations in the order determined by Lender.

(b) Upon the occurrence and during the continuance of any Event of Default, Lender, may, in addition to the remedies provided in Section 6.2(a), exercise and enforce any and all other rights and remedies available to it, whether arising under any Loan Document or under applicable law, in any manner deemed appropriate by Lender, including suit in equity, action at law, seeking the appointment of a receiver, or other appropriate proceedings, whether for the specific performance (to the extent permitted by law) of any covenant or agreement contained in any Loan Document or in aid of the exercise of any power granted in any Loan Document.

(c) Upon the occurrence and during the continuance of any Event of Default, Lender may at any time and from time to time, without notice to any Borrower (any requirement for such notice being expressly waived by each Borrower) set off and apply against any and all of the obligations of Borrowers now or hereafter existing under this Agreement, whether owing to Lender or any Affiliate of Lender, any and all deposits (general or special, time or demand, provisional or final) at any time held and other indebtedness at any time owing by Lender to or for the credit or the account of any Borrower and any property of any Borrower from time to time in possession of Lender, irrespective of whether or not Lender shall have made any demand hereunder and although such obligations may be contingent and unmatured. Each Borrower hereby grants to Lender a lien on and security interest in all such deposits, indebtedness and property as collateral security for the payment and performance of the obligations of Borrowers under the Loan Documents. The rights of Lender under this Section 6.2(c) are in addition to other rights and remedies (including, without limitation, other rights of setoff) which Lender may have.

(d) Default Rate of Interest. Upon and after the occurrence and during the continuance of an Event of Default, at the election of Lender, all interest accruing in respect of any loan or other obligation of Borrowers under this Agreement shall be increased by a per annum percentage equal to 2% over the otherwise applicable rate.

6.3. Protective Advances. Any contrary provision of this Agreement or any other Loan Document notwithstanding, Lender hereby is authorized by each Borrower, from time to time in Lender's sole discretion, to make Loans to, or for the benefit of, Borrowers that Lender deems necessary or desirable (1) to preserve or protect the Collateral, or any portion thereof (including, without limitation, for payment of taxes, payment of insurance premiums, discharge of Liens etc.), or (2) to enhance the likelihood of repayment of the Obligations (any of the advances described in this Section 6.3 shall be referred to as "Protective Advances"). Each Protective Advance shall be deemed to be a Loan for purposes of this Agreement and the other Loan Documents. The Protective Advances shall be repayable on demand, secured by the Collateral, constitute Obligations hereunder, and bear interest at the Loan Rate.

## ARTICLE 7.
## MISCELLANEOUS

7.1. Amendments; Consents and Waivers; Authentication. No amendment or modification of any Loan Documents, or any other document or agreement described in or related to this Agreement, or consent to or waiver of any Event of Default, or consent to or waiver of the application of any covenant or representation set forth in any of the Loan Documents, or any other document or agreement described in or related to this Agreement, or any release of Lender's security interest in any Collateral, shall be effective unless it has been agreed to by Lender and memorialized in a written agreement that: (a) specifically states that it is intended to amend or modify specific Loan Documents, or any other document or agreement described in or related to this Agreement, or waive any Event of Default or the application of any covenant or representation of any terms of specific Loan Documents, or any other document or agreement described in or related to this Agreement, or is intended to release Lender's security interest in specific Collateral; and (b) is executed by an authorized employee or officer of both parties, or by an authorized employee or officer of Lender with respect to a consent or waiver. The terms of an amendment, consent or waiver memorialized in any written agreement shall be effective only to the extent, and in the specific instance, and for the limited purpose to which Lender has agreed.

7.2. Notices.

(a) All notices and other communications hereunder shall be in writing and shall be delivered or sent to Borrowers and Lender at the respective addresses for notices set forth on the signatures pages hereof, or to such other address as may be designated by any Borrower or Lender by notice to the other party hereto. All notices and other communications shall be deemed to have been given at the time of actual receipt thereof at such address, (i) if sent by certified or registered mail, postage prepaid, to such address, (ii) if sent by e-mail, or (iii) if sent by facsimile transmission.

(b) Any notice to be given by Borrowers to Lender pursuant to Section 2.3, may be given by telephone, and all such notices given by Borrowers must be promptly confirmed in writing in the manner provided in Section 7.2(a). Any such notice given by telephone shall be deemed effective upon receipt thereof by the party to whom such notice is to be given (in an actual conversation and not by voicemail or similar service). Borrowers shall indemnify and hold harmless Lender from any and all losses, damages, liabilities and claims arising from their good faith reliance on any such telephone notice except to the extent resulting from Lender's gross negligence or willful misconduct.

7.3. No Waiver By Conduct; Remedies Cumulative. No delay or omission on Lender's part in exercising any right, remedy or option shall operate as a waiver of such or any other right, remedy or option or of any Event of Default. No right or remedy conferred upon or reserved to Lender under any Loan Document is intended to be exclusive of any other right or remedy, and every right and remedy shall be cumulative and in addition to every other right or remedy granted thereunder or now or hereafter

existing under any applicable law. Every right and remedy granted by any Loan Document or by applicable law to Lender may be exercised from time to time and as often as may be deemed expedient by Lender and, unless contrary to the express provisions of any Loan Document, irrespective of the occurrence or continuance of any Event of Default.

7.4. Reliance on and Survival of Various Provisions. All terms, covenants, agreements, representations and warranties of Borrowers made herein or in any other Loan Document or in any certificate, report, financial statement or other document furnished by or on behalf of any Borrower in connection with this Agreement shall be deemed to be material and to have been relied upon by Lender, notwithstanding any investigation heretofore or hereafter made by Lender or on Lender's behalf, and those covenants and agreements of Borrowers set forth in Sections 3.5, 3.6 and 7.5 hereof shall survive the repayment in full of the Secured Obligations and the maturity of the Loans.

7.5. Expenses; Indemnification.

(a) Each Borrower agrees, on a joint and several basis, to pay all costs, expenses (including reasonable attorneys' fees), and disbursements incurred by Lender on any Borrower's behalf (i) the reasonable fees and expenses of counsel to Lender, including without limitation the reasonable fees and expenses of Dickinson Wright PLLC, in connection with the preparation, execution, delivery and administration of the Loan Documents and in connection with advising Lender as to its rights and responsibilities with respect thereto, and in connection with any amendments, waivers or consents in connection therewith, (ii) in all efforts made to enforce payment of the Secured Obligations or effect collection of any Collateral, (iii) in connection with entering into, modifying, amending, and enforcing this Agreement or any consents or waivers hereunder and all related agreements, documents and instruments, (iv) in maintaining, storing, or preserving any Collateral, or in instituting, enforcing and foreclosing on Lender's security interest in any Collateral or possession of any premises containing any Collateral, whether through judicial proceedings or otherwise, (v) in defending or prosecuting any actions or proceedings arising out of or relating to Lender's transactions with Borrowers, or (vi) in connection with any advice given to Lender with respect to its rights and obligations under this Agreement and all related agreements. Expenses being reimbursed by Borrowers under this section include costs and expenses incurred in connection with: (i) appraisals and insurance reviews; (ii) environmental examinations and reports; (iii) field examinations and the preparation of reports based thereon; (iv) the fees charged by a third party retained by Lender or the internally allocated fees for each Person employed by Lender with respect to each field examination; (v) background checks regarding senior management and/or key investors, as deemed necessary or appropriate in the sole discretion of Lender; (vi) taxes, fees and other charges for (A) lien and title searches and title insurance and (B) the recording of any mortgages, filing of any financing statements and continuations, and other actions to perfect, protect, and continue Lender's security interests; (vii) sums paid or incurred to take any action required of any Borrower under the Loan Documents that Borrowers fail to pay or take; and (viii) forwarding loan proceeds, collecting checks and other items of payment, and costs and expenses of preserving and protecting the Collateral.

(b) In consideration of the execution and delivery of this Agreement by Lender and the making of the Loans, Borrowers hereby, on a joint and several basis, indemnify, exonerate and hold Lender and its respective officers, directors, employees and agents (collectively, the "Indemnified Parties") free and harmless from and against any and all actions, causes of action, suits, losses, costs, liabilities and damages, and expenses incurred in connection therewith (irrespective of whether any such Indemnified Party is a party to the action for which indemnification hereunder is sought), including reasonable attorneys' fees and disbursements (collectively, the "Indemnified Liabilities"), incurred by the Indemnified Parties or any of them as a result of, or arising out of, or relating to:

(i) any acquisition or any other transaction financed or to be financed in whole or in part, directly or indirectly, with the proceeds of any Loan;

(ii) the entering into and performance of this Agreement and any other agreement or instrument executed in connection herewith by any of the Indemnified Parties (including any action brought by or on behalf of any Borrower as the result of any determination by Lender not to fund any Loan);

(iii) any investigation, litigation or proceeding related to any acquisition or proposed acquisition by any Loan Party of any portion of the stock or assets of any Person, whether or not Lender is party thereto;

(iv) any investigation, litigation or proceeding related to any environmental cleanup, audit, compliance or other matter relating to the protection of the environment or the release by any Loan Party of any Hazardous Material;

(v) the presence on or under, or the escape, seepage, leakage, spillage, discharge, emission, discharging or releasing from, any real property owned or operated by any Loan Party of any Hazardous Material (including any losses, liabilities, damages, injuries, costs, expenses or claims asserted or arising under any Environmental Law), regardless of whether caused by, or within the control of, any Borrower;

(vi) any Loan or the use thereof; or

(vii) any other claim by reason of or in connection with Lender entering into this Agreement or any other Loan Documents or the transactions contemplated thereby.

Notwithstanding the foregoing, Borrowers shall not be required to indemnify any Indemnified Party for any damage or claim caused by the relevant Indemnified Party's gross negligence or willful misconduct. If and to the extent that the foregoing undertaking may be unenforceable for any reason, Borrowers hereby agree to make the maximum contribution to the payment and satisfaction of each of the Indemnified Liabilities which is permissible under applicable law. Borrowers shall be obligated to indemnify the Indemnified Parties for all Indemnified Liabilities subject to and pursuant to the foregoing provisions, regardless of whether any Loan Party had knowledge of the facts and circumstances giving rise to such Indemnified Liability.

7.6. Successors and Assigns. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns; provided, that no Borrower may, without the prior consent of Lender, assign its rights or obligations hereunder or under any Loan Document and Lender shall not be obligated to make any Loan hereunder to any entity other than Borrowers. Lender from time to time in its sole discretion may appoint agents for the purpose of servicing and administering this Agreement and the transactions contemplated hereby and enforcing or exercising any rights or remedies of Lender provided under the Loan Documents or otherwise. In furtherance of such agency, Lender may from time to time direct that Borrowers provide notices, reports and other documents contemplated by this Agreement (or duplicates thereof) to such agent. Borrowers hereby consent to the appointment of such agent and agrees to provide all such notices, reports and other documents and to otherwise deal with such agent acting on behalf of Lender in the same manner as would be required if dealing with Lender itself.

7.7. Counterparts. This Agreement may be executed in any number of counterparts, all of which taken together shall constitute one and the same instrument, and any of the parties hereto may execute this Agreement by signing any such counterpart.

7.8. Governing Law. This Agreement is a contract made under, and shall be governed by and construed in accordance with, the law of the State of Michigan applicable to contracts made and to be performed entirely within such State and without giving effect to choice of law principles of such State. Each Borrower further agrees that any legal or equitable action or proceeding with respect to any Loan Document or the transactions contemplated hereby may be brought in any court of the State of Michigan, or in the United States District Court for the Eastern District of Michigan, and each Borrower hereby submits to and accepts generally and unconditionally the jurisdiction of those courts with respect to its Person and property. Nothing in this paragraph shall limit the right of Lender to bring any such action or proceeding against Borrowers or their property in the courts of any other jurisdiction.

7.9. Table of Contents and Headings. The table of contents and the headings of the various subdivisions hereof are for the convenience of reference only and shall in no way modify any of the terms or provisions hereof.

7.10. Construction of Certain Provisions. If any provision of this Agreement refers to any action to be taken by any Person, or which such Person is prohibited from taking, such provision shall be applicable whether such action is taken directly or indirectly by such Person, whether or not expressly specified in such provision.

7.11. Integration and Severability. The Loan Documents embody the entire agreement and understanding among Borrowers and Lender, and supersede all prior agreements and understandings, relating to the subject matter hereof. In case any one or more of the obligations of any Borrower under any Loan Document shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining obligations of Borrowers shall not in any way be affected or impaired thereby, and such invalidity, illegality or unenforceability in one jurisdiction shall not affect the validity, legality or enforceability of the obligations of any Borrower under any Loan Document in any other jurisdiction.

7.12. Independence of Covenants. All covenants hereunder shall be given independent effect so that if a particular action or condition is not permitted by any such covenant, the fact that it would be permitted by an exception to, or would be otherwise within the limitations of, another covenant shall not avoid the occurrence of an Event of Default if such action is taken or such condition exists.

7.13. Interest Rate Limitation. Notwithstanding any provisions of any Loan Document, in no event shall the amount of interest paid or agreed to be paid by any Borrower exceed an amount computed at the highest rate of interest permissible under applicable law. If, from any circumstances whatsoever, fulfillment of any provision of any Loan Document at the time performance of such provision shall be due, shall involve exceeding the interest rate limitation validly prescribed by law which a court of competent jurisdiction may deem applicable hereto, then, ipso facto, the obligations to be fulfilled shall be reduced to an amount computed at the highest rate of interest permissible under applicable law, and if for any reason whatsoever Lender shall ever receive as interest an amount which would be deemed unlawful under such applicable law such interest shall be automatically applied to the payment of principal of the Loans outstanding hereunder (whether or not then due and payable) and not to the payment of interest, or shall be refunded to Borrowers if such principal and all other obligations of Borrowers to Lender have been paid in full.

7.14. Nonliability of Lender. Lender undertakes no responsibility to any Loan Party to review or inform any Loan Party of any matter in connection with any phase of the business or operations. Each Borrower agrees that Lender shall not have liability to any Borrower (whether sounding in tort, contract or otherwise) or any Loan Party for losses suffered by any Loan Party in connection with, arising out of, or in any way related to, the transactions contemplated and the relationship established by the Loan Documents, or any act, omission or event occurring in connection therewith or otherwise, unless it is determined in a final non-appealable judgment by a court of competent jurisdiction that such losses resulted from the gross negligence or willful misconduct of the party from which recovery is sought. Lender shall have no liability with respect to, and each Borrower hereby waives, releases and agrees not to sue for, any special, indirect or consequential damages suffered by any Loan Party in connection with, arising out of, or in any way related to the Loan Documents or the transactions contemplated thereby.

7.15. Waiver of Jury Trial. The parties hereto acknowledge and agree that there may be a constitutional right to a jury trial in connection with any claim, dispute or lawsuit arising between or among them, but that such right may be waived. Accordingly, the parties agree that, notwithstanding such constitutional right, in this commercial matter the parties believe and agree that it shall in their best interests to waive such right, and, accordingly, hereby waive such right to a jury trial, and further agree that the best forum for hearing any claim, dispute, or lawsuit, if any, arising in connection with this Agreement, the Loan Documents, or the relationship among the parties hereto, in each case whether now existing or hereafter arising, or whether sounding in contract or tort or otherwise, shall be a court of competent jurisdiction sitting without a jury.

7.16. USA PATRIOT Act. To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify, and record information that identifies each entity or person who opens an account or establishes a relationship with Lender. What this means: When an entity or person opens an account or establishes a relationship with Lender, Lender may ask for the name, address, date of birth, and other information that will allow Lender to identify the entity or person who opens an account or establishes a relationship with Lender. Lender may also ask to see identifying documents for the entity or person.

7.17. Waiver of Notice. Each Borrower hereby waives notice of non-payment, demand, presentment, protest and notice thereof with respect to any and all instruments, notice of acceptance hereof, notice of loans or advances made, credit extended, collateral received or delivered, or any other action taken in reliance hereon, and all other demands and notices of any description, except such as are expressly provided for herein.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered as of the day and year first above written.

**LET'S SHAKE, L.L.C.**

By:______________________________
Name: Dan Patel
Title: Vice President

Address for Notices for all Borrowers:

13355 Noel Road, Suite 1645
Dallas, Texas 75240
Attention: John Fox
Email: jfox@sscpmanagment.com

**THE HUNTINGTON NATIONAL BANK**

By: ______________________________
Name: Jared Hill
Title: Vice President

Address for Notices:

41 S. High Street
Columbus, OH 43215
Attention: Jared Hill
Facsimile No.: (888) 527-6309
Phone No.: (614) 480-4859
E-mail: jared.hill@huntington.com

THIS IS A COPY
This is a copy view of the Authoritative Copy held by the designated custodian

# FIRST AMENDMENT TO LOAN AGREEMENT AND WAIVER AND FIRST AMENDMENT TO SECURITY AGREEMENT

THIS FIRST AMENDMENT TO LOAN AGREEMENT AND WAIVER AND FIRST AMENDMENT TO SECURITY AGREEMENT, dated as of October 27, 2022 (this "Agreement"), is by and between **LET'S SHAKE, L.L.C.**, a Texas limited liability company (the "Borrower") and **THE HUNTINGTON NATIONAL BANK**, a national banking association (the "Lender").

## RECITALS

A. The Borrower and the Lender are parties to a Loan Agreement dated as of December 4, 2020 (as now and hereafter amended or modified, the "Loan Agreement"). In connection with the Loan Agreement, the Borrower executed and delivered in favor of the Lender a Security Agreement dated as of December 4, 2020 (as now and hereafter amended or modified, the "Security Agreement").

B. The Borrower has requested that the Lender amend certain terms of the Loan Agreement and the Security Agreement and the Lender is willing to do so, subject to the terms and conditions set forth herein.

## TERMS

In consideration of the premises and of the mutual agreements herein contained, the parties agree as follows:

## ARTICLE I WAIVER.

The following Events of Default have occurred under the Loan Agreement (such Events of Default are referred to each individually as an "Existing Default" and collectively as the "Existing Defaults"), and the Borrower has requested that the Lender waive such Existing Default:

(a) The Consolidated Fixed Charge Coverage Ratio (Pre-Distribution) for the Fiscal Quarter ending June 30, 2022 was less than 1.25 to 1.0, which is not permitted pursuant to Section 5.3(a) of the Loan Agreement. The Consolidated Fixed Charge Coverage Ratio (Pre-Distribution) was 1.12 to 1.0 for the Fiscal Quarter ending June 30, 2022.

(b) The Consolidated Lease Adjusted Leverage Ratio for the Fiscal Quarters ending March 31, 2022 and June 30, 2022 was greater than 5.25 to 1.0, which is not permitted pursuant to Section 5.3(c) of the Loan Agreement. The Consolidated Lease Adjusted Leverage Ratio was 5.55 to 1.0 for the Fiscal Quarter ending March 31, 2022 and 6.86 to 1.0 for the Fiscal Quarter ending June 30, 2022.

Pursuant to such request, and subject to (a) the accuracy of the representations of the Borrower hereunder and the compliance by the Borrower with the agreements herein, and (b) the satisfaction of the conditions to the effectiveness of this Agreement specified in Article IV hereof, the Lender hereby waives the Existing Defaults. The Borrower acknowledges and agrees that the waivers contained herein are limited, specific and one-time waivers as described above. Such waiver shall not modify or waive any other Event of Default or Default or any other term, covenant or agreement contained in any of the Loan Documents, and shall not be deemed to have prejudiced any present or future right or rights which the Lender now has or may have under the Loan Agreement or the other Loan Documents and, in addition,

COPY VIEW

THIS IS A COPY
This is a copy view of the Authoritative Copy held by the designated custodian

shall not entitle the Borrower to a waiver, amendment, modification or other change to, of or in respect of any provision of any of the Loan Documents in the future in similar or dissimilar circumstances.

For avoidance of doubt and notwithstanding anything to the contrary in the Loan Agreement, the Lender acknowledges and agrees that the financial covenants set forth in Section 5.3(a) of the Loan Agreement (Consolidated Fixed Charge Coverage Ratio (Pre-Distribution)) and Section 5.3(c) of the Loan Agreement (Consolidated Lease Adjusted Leverage Ratio) will not be measured for the Fiscal Quarters ending September 30, 2022 and December 31, 2022; provided, that, the Consolidated Lease Adjusted Leverage Ratio will be calculated at the end of each Fiscal Quarter as described in Section 5.3(c) for the purpose of determining the Applicable Margin.

**ARTICLE II AMENDMENTS TO LOAN AGREEMENT.**

Subject to Article V hereof, the Loan Agreement is amended as follows:

2.1 The definition of "Applicable Margin" in Section 1.1 is amended by adding the following language at the end thereof:

Notwithstanding anything herein to the contrary, the "Applicable Margin" shall be 3.25% if the Consolidated Lease Adjusted Leverage Ratio (calculated at the end of each Fiscal Quarter as described in Section 5.3(c)) is greater than 6.00 to 1.00. Any increase or decrease in the Applicable Margin resulting from a change in the Consolidated Lease Adjusted Leverage Ratio shall become effective as of the first Business Day immediately following the date a Compliance Certificate is delivered in accordance with Section 5.1(d)(iv); provided, however, that if such Compliance Certificate is not delivered when due in accordance with Section 5.1(d)(iv), then the Applicable Margin shall be 3.25% and it shall apply as of the first Business Day after the date on which such Compliance Certificate was required to have been delivered until the date on which such Compliance Certificate is delivered (on which date the Applicable Margin shall be set at the margin based upon the calculations in such Compliance Certificate).

2.2 The following definition shall be added to Section 1.1 in appropriate alphabetical order to read as follows:

"First Amendment Effective Date" means the later of (i) October 27, 2022 or (ii) the date on which all of the conditions to effectiveness of the First Amendment to Loan Agreement dated as of October 27, 2022 between the Borrower and the Lender have been satisfied.

2.3 Section 3.9 is amended and restated to read as follows:

3.9 LIBOR Transition. On March 5, 2021 the Financial Conduct Authority, the regulatory supervisor of LIBOR's administrator, announced in a public statement the future cessation or loss of representativeness of the one-month LIBOR tenor setting. Notwithstanding anything to the contrary in this Agreement or any other Loan Document, Lender may amend this Agreement at any time to replace the LIBO Rate with a Replacement Index and, from time to time, Lender may amend this Agreement to make such technical, administrative or operational changes that Lender reasonably determines are appropriate to reflect the adoption of such Replacement Index and permit the administration thereof by Lender. Any amendment pursuant to this Section shall become effective upon written notice thereof to Borrower, without any further action or consent of Borrower. As used in this Section:

COPY VIEW

THIS IS A COPY
This is a copy view of the Authoritative Copy held by the designated custodian

"LIBOR" means the London interbank offered rate for U.S. dollars.

"Relevant Governmental Body" means the Board of Governors of the Federal Reserve System or the Federal Reserve Bank of New York, or a committee officially endorsed or convened by the Board of Governors of the Federal Reserve System or the Federal Reserve Bank of New York, or any successor thereto.

"Replacement Index" means the sum of: (x) the alternate index rate (which will be based on SOFR) that has been selected by Lender and (y) the spread adjustment selected or recommended by the Relevant Governmental Body for the replacement of the applicable tenor of LIBOR with a SOFR-based rate; provided, that if the Replacement Index shall be less than 0.50%, such rate shall be deemed to be 0.50% for purposes of this Agreement. If such alternate index rate becomes unavailable, Lender may select a replacement index rate and spread adjustment giving due consideration to (i) any selection or recommendation by the Relevant Governmental Body or (ii) any evolving or then-prevailing market convention for such rate or adjustment.

"SOFR" means a rate per annum equal to the secured overnight financing rate published by the Federal Reserve Bank of New York (or a successor administrator of the secured overnight financing rate) on the website of the Federal Reserve Bank of New York, currently at http://www.newyorkfed.org (or any successor source for the secured overnight financing rate identified as such by the administrator of the secured overnight financing rate from time to time).

2.4 Section 5.1(d)(iv) is amended by deleting the reference therein to "Together with the financial statements delivered pursuant to Section 5.1(d)(ii) and (iii) above" and inserting the following in place thereof: "Together with the financial statements delivered pursuant to Section 5.1(d)(ii), (iii) and (vii)".

2.5 Section 5.1(d) is amended by re-designating Section 5.1(d)(vii) as Section 5.1(d)(viii) and adding a new Section 5.1(d)(vii) to read as follows:

(vii) As soon as available and in any event within 45 days after the end of each month during the period from and including October 1, 2022 through and including February 28, 2023, the balance sheet of the Company and its Subsidiaries as of the end of such month and the related statements of income, for the period commencing at the end of the previous fiscal year and ending with the end of such month (including a break out of reporting by Restaurant, in form and detail satisfactory to Lender), prepared by Company and setting forth in each case in comparative form the corresponding figures for the corresponding date or period of the preceding fiscal year, all in reasonable detail and duly certified (subject to year-end audit adjustments) by the president, chief executive officer, managing member or chief financial officer of Company as having been prepared in accordance with GAAP;

2.6 Section 5.1(i) is amended and restated in its entirety to read as follows:

(i) Bank Accounts. On or before November 15, 2022, provide to the Lender a deposit account control agreement, in form and substance satisfactory to the Lender, duly executed on behalf of each financial institution with respect to all accounts described on Schedule 5.1(i) hereto and any other account requested by the Lender from time to time.

2.7 Section 5.2(f) is amended and restated in its entirety to read as follows:

COPY VIEW

THIS IS A COPY
This is a copy view of the Authoritative Copy held by the designated custodian

(f) Restricted Payments. Make, pay, declare or authorize any Restricted Payment other than: (i) such Restricted Payments constituting Tax Distributions; (ii) Restricted Payments paid by any Subsidiary to any Borrower; (iii) management fees paid to SCCP Management, Inc. in an aggregate amount not to exceed two percent of aggregate net sales of Borrower in any calendar year so long as both before and after giving pro forma effect to the payment of such fees, no Event of Default shall have occurred and be continuing, and (iv) on or after delivery of the Compliance Certificate for the fiscal quarter ending March 31, 2023, other Restricted Payments so long as both before and after giving pro forma effect to the payment of such Restricted Payment, no Event of Default shall have occurred and be continuing. No Borrower will issue any Disqualified Stock.

2.8 The first paragraph of Section 5.3(a) is amended and restated in its entirety to read as follows:

(a) Consolidated Fixed Charge Coverage Ratio (Pre-Distribution). Borrowers will not permit or suffer the ratio of (i) an amount equal to Consolidated EBITDAR, to (ii) Consolidated Fixed Charges, as calculated at the end of each Fiscal Quarter for the most-recently ended Reference Period, commencing with the Fiscal Quarter ending March 31, 2023, to be less than 1.25 to 1.00.

2.9 The first paragraph of Section 5.3(c) is amended and restated in its entirety to read as follows:

(c) Consolidated Lease Adjusted Leverage Ratio. Borrowers will not permit or suffer the ratio of (i) Consolidated Lease-Adjusted Total Funded Indebtedness to (ii) Consolidated EBITDAR (as defined above) (the "Consolidated Lease Adjusted Leverage Ratio"), as calculated at the end of each Fiscal Quarter for the most-recently ended Reference Period, commencing with the Fiscal Quarter ending March 31, 2023, to be greater than 5.25 to 1.0.

2.10 Section 5.3 is amended by adding a new Section 5.3(d) at the end thereof to read as follows:

(d) Minimum Liquidity. Borrower shall maintain Liquidity of not less than $2,500,000, measured as of the last day of each of calendar month during the period from and including October 1, 2022 through and including March 31, 2023. As used herein, "Liquidity" shall mean the sum of all cash plus the fair market value of all readily marketable securities owned solely by or held solely in the name of the Borrower and not subject to any transfer or other restriction or any lien or other encumbrance, as reflected in the Borrower's financial statements delivered pursuant to Section 5.1(d) hereof.

2.11 Article 6 is amended by adding a new Section 6.4 at the end thereof to read as follows:

6.4 Equity Cure. Notwithstanding anything herein to the contrary, for purposes of determining compliance with the financial covenant in Section 5.3(b) for the Fiscal Quarters ending September 30, 2022 and December 31, 2022, cash equity contributions (which shall be common equity or preferred equity that is not Disqualified Stock) made to any direct or indirect parent of Borrower and then contributed to the Borrower in cash after the applicable Fiscal Quarter-end being tested but on or prior to the day that is 15 Business Days after the day on which Compliance Certificates are required to be delivered will, at the request of the Borrower,

COPY VIEW

THIS IS A COPY
This is a copy view of the Authoritative Copy held by the designated custodian

be included in the calculation of Consolidated EBITDAR on a dollar-for-dollar basis solely for purposes of determining compliance with the such financial covenant as of such date and for any applicable measurement period that includes such date (any such equity contribution so included in the calculation of Consolidated EBITDAR, a "Specified Equity Contribution"); provided that (a) the amount of any individual Specified Equity Contribution shall not exceed the amount required to cause the Borrower to be in pro forma compliance with such financial covenant as of the last day of the applicable Fiscal Quarter and for the period of four consecutive fiscal months ending on such date, (b) 100% of the amount of any Specified Equity Contribution shall be applied to prepay the Loans as set forth in Section 3.1(b), and (c) the Specified Equity Contributions shall be disregarded for all other purposes under the Loan Documents, including calculation of any financial covenants other than the financial covenant in Section 5.3(b).

2.12 Schedule 5.1(i) is hereby added to the Credit Agreement in the form of Schedule 5.1(i) attached hereto.

**ARTICLE III** AMENDMENTS TO SECURITY AGREEMENT.

Subject to Article V hereof, the Security Agreement is amended as follows:

3.1 The Borrower hereby agrees that (i) the deposit accounts described on Schedule 5.1(i) attached hereto shall be added to Schedule 4 of the Security Agreement and (ii) such deposit accounts shall become a part of the Collateral referred to in said Security Agreement and shall secure all Secured Obligations referred to in the Security Agreement.

**ARTICLE IV** **REPRESENTATIONS AND WARRANTIES.** The Borrower represents and warrants to Lender that:

4.1 The execution, delivery, and performance of this Agreement are within its powers, have been duly authorized by all necessary action, and are not in contravention of any law, the terms of its Certificate of Formation or Operating Agreement, or of any undertaking to which it is a party or by which it or its properties is bound.

4.2 This Agreement is the legal, valid, and binding obligation of the Borrower, enforceable against it in accordance with the respective terms hereof.

4.3 The Consent of the Manager of the Borrower dated December 4, 2020 delivered to the Lender are in full force and effect as of the date hereof and the certifications in the closing certificates dated December 4, 2020 delivered to the Lender are true and correct as of the date hereof.

4.4 After giving effect to the amendments herein contained, the representations and warranties contained in Article 4 of the Loan Agreement are true on and as of the date hereof with the same force and effect as if made on and as of the date hereof.

4.5 Other than the Existing Defaults, no Event of Default or Default exists or has occurred and is continuing on the date hereof.

**ARTICLE V** **CONDITIONS OF EFFECTIVENESS.**

This Agreement shall be effective as of the date hereof when each of the following conditions is satisfied, all in form and substance satisfactory to the Lender (the "Amendment Effective Date"):



COPY VIEW

THIS IS A COPY
This is a copy view of the Authoritative Copy held by the designated custodian

5.1 This Agreement is duly executed on behalf of the Borrower and the Lender.

5.2 The Borrower shall have moved $2,250,000 to deposit accounts at Lender.

5.3 SCCP Management, Inc. shall have executed and delivered a management fee subordination agreement in favor of the Lender.

5.4 Each Loan Party shall execute and/or deliver to the Lender such additional documents, agreements and instruments (in form and substance satisfactory to the Lender) as the Lender shall reasonably require.

**ARTICLE VI <u>MISCELLANEOUS</u>.**

6.1 From and after the date of this Agreement, (i) references in the Loan Agreement or in any other Loan Document to the Loan Agreement shall be deemed to be references to the Loan Agreement, as amended hereby and as further amended from time to time, and (ii) references in the Security Agreement or in any other Loan Document to the Security Agreement shall be deemed to be references to the Security Agreement, as amended hereby and as further amended from time to time .

6.2 The Borrower acknowledges and agrees that the Lender has fully performed all of its obligations under all documents executed in connection with the Loan Agreement and all actions taken by the Lender are reasonable and appropriate under the circumstances and within its rights under the Loan Agreement and all other documents executed in connection therewith and otherwise available. The Borrower represents and warrants that it has no claims or causes of action against the Lender.

6.3 Except as expressly amended hereby, the Borrower agrees that the Loan Agreement, the Note and the other Loan Documents are ratified and confirmed and shall remain in full force and effect, and that it has no set off, counterclaim, or defense with respect to any of the foregoing.

6.4 Terms used but not defined herein shall have the respective meanings ascribed thereto in the Loan Agreement.

6.5 This Agreement shall be governed by and construed in accordance with the laws of the State of Michigan.

6.6 This Agreement may be signed in any number of counterparts, with the same effect as if the signatures thereto and hereto were upon the same instrument. Facsimile signatures and electronic signatures sent in PDF format are treated as originals.

[SIGNATURES ON NEXT PAGE]

COPY VIEW

THIS IS A COPY
This is a copy view of the Authoritative Copy held by the designated custodian

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed and delivered as of the date first written above.

**LET'S SHAKE, L.L.C.**

By: DocuSigned by: Dan Patel 38FA38F345304F6...
Name: Dan Patel
Title: Vice President

**THE HUNTINGTON NATIONAL BANK**

By: DocuSigned by: Jared Hill 56F6DDC8FF1A4C5...
Name: Jared Hill
Title: Vice President

4870-1857-1318 v2 [25535-403]

COPY VIEW

DocuSign Envelope ID: 3B7CA1B1-8AB3-4596-9E59-8E80BAFA733F

THIS IS A COPY
This is a copy view of the Authoritative Copy held by the designated custodian

**SCHEDULE 5.1(i)**

**DEPOSIT ACCOUNTS REQUIRING CONTROL AGREEMENTS**

| Bank Name | Account No. | Purpose of Account |
|---|---|---|
| East West Bank | 8003231464 | Primary Operating Account |
| Encore Bank | 700198054 | Investment/Surplus |

COPY VIEW